680 N.E.2d 1355 (1997)
176 Ill.2d 536
223 Ill.Dec. 919
In re B.C. et al., Minors (The People of the State of Illinois, Appellant, v. B.C., et al., Appellees).
No. 80715.
Supreme Court of Illinois.
May 22, 1997.
*1356 Gerry R. Arnold, State's Attorneys App. Pros. Mt. Vernon, Fifth Judicial District, Jim Ryan, Attorney General, Criminal Appeals Div, Chicago, and State's Attorney Madison County, Edwardsville, for the People.
Richard A. Devine, State's Attorney Cook County, Crim. Appeals Div. and Alan J. Spellberg, Assistant State's Attorney, Chicago, for Citizens of Cook County.
State Appellate Defender Mt. Vernon, Fifth Judicial District and Rita Peterson, State Appellate Defender, Mt. Vernon, for B.C.
Ruth L. Lansner, Anti-Defamation League, Chicago, for Anti-Defamation League Amicus Curiae.
Clyde E. Murphy, Chicago, for Chicago Lawyers' Committee.
*1357 Gary Feinerman, Mayer, Brown & Platt and Jenner & Block, Chicago, for the American Jewess Congress.
Chief Justice FREEMAN, delivered the opinion of the court.
The question presented by this appeal is whether section 12-7.1(a) of the Criminal Code of 1961 (the hate crime statute) (720 ILCS 5/12-7.1(a) (West 1994)) requires that the victim of the offense be the individual, or of the group of individuals, whose actual or perceived race, color, creed, religion, ancestry, gender, sexual orientation, physical or mental disability, or national origin provided reason for the offense. We hold that section 12-7.1(a) does not impose such a requirement.

BACKGROUND
On January 8, 1995, the State filed petitions in the circuit court of Madison County charging respondents, B.C. and T.C., as delinquent minors (see 705 ILCS 405/1-1 et seq. (West 1994)) for committing the offense of disorderly conduct (see 720 ILCS 5/26-1 (West 1994)). On March 17, 1995, the State amended the petitions to charge respondents with delinquency for committing a hate crime under section 12-7.1(a) of the Criminal Code. The petitions essentially alleged that, on October 14, 1994, in Madison County, respondents knowingly committed disorderly conduct (720 ILCS 5/26-1 (West 1994)) by displaying "patently offensive depictions of violence toward African Americans in such an unreasonable manner as to alarm and disturb James Jeffries and provoke a breach of the peace in violation of 720 ILCS 5/12-7.1 * * * and against the dignity of the People of the State of Illinois * * *."
At the adjudication hearing, the parties stipulated that Jeffries was not an African-American, nor did the defendants perceive him to be, but that other unnamed individuals who were African-Americans were present at the time the offense was allegedly committed. Also, such unnamed individuals were not identified in the petitions as victims. It was also stipulated that the allegedly patently offensive depictions of violence toward African-Americans were confiscated from the respondents. The depictions were subsequently admitted without objection.
In response to respondents' motion to dismiss the charges (725 ILCS 5/114-1(a)(8) (West 1994)), and based on the factual stipulations, the circuit court dismissed the petitions for failure to state an offense. The court found that the charges could not be sustained because Jeffries was not actually and was not perceived to be, by defendants, a member of "the protected classifications" and that such was a necessary element of the offense of hate crime. The State appealed the dismissals. 134 Ill.2d R. 604(a)(1).
On review, the appellate court reasoned that if the victim of a hate crime was not, or at least thought to be, a member of "the targeted group," under the statute, the word "perceived" within the provision would be superfluous. Finding also the statute to be ambiguous, the appellate court interpreted legislative debate to indicate an intent that the word "perceived" encompass situations where a victim is considered of a particular race by an accused, but is actually not. The appellate court affirmed the dismissal of the petitions because Jeffries was not, and was not perceived to be, African-American. 277 Ill.App.3d 1085, 214 Ill.Dec. 703, 661 N.E.2d 1148. The appellate court, in effect, held that under the Act, the alleged victim must be or be perceived, by an accused, a member of one of the classes named in the statute.
We subsequently granted the State's petition for leave to appeal (155 Ill.2d R. 315(b)) and now reverse and remand to the circuit court for further proceedings consistent with this opinion.

SECTION 12-7.1
In 1983, section 12-7.1 was added to the Criminal Code of 1961 (Pub. Act 82-995, § 1, eff. January 1, 1983) and provided in pertinent part:
"Ethnic intimidation. (a) A person commits ethnic intimidation when, by reason of the race, color, creed, religion or national origin of another individual or group of individuals, he commits assault, criminal trespass to residence, criminal trespass to real property or mob action as these *1358 crimes are defined in * * * this Code, respectively.
(b) Ethnic intimidation is a Class A misdemeanor; provided, however, that any person who commits ethnic intimidation as a participant in a mob action, as defined in Section 25-1 of this Code, which results in the violent infliction of injury to the person or property of another shall be guilty of a Class 3 felony." Ill.Rev.Stat.1989, ch. 38, pars. 12-7.1(a), (b).
Section 12-7.1 was based on model hate crime legislation proposed to the states by the Anti-Defamation League of B'nai B'rith. See C. Gaumer, Punishment For Prejudice: A Commentary on the Constitutionality and Utility of State Statutory Responses to the Problem of Hate Crimes, 39 S.D.L.Rev. 1, 9 (1994).
In 1991 and 1992, the legislature amended section 12-7.1 by changing the name of the offense from "Ethnic intimidation" to "Hate crime" and by increasing the number of classes, by reason of which the hate crime occurred, and the number of predicate criminal offenses which might constitute a hate crime. Pub. Act 86-1418, eff. January 1, 1991 (amending Ill.Rev.Stat.1989, ch. 38, par. 12-7.1); Pub. Act 87-440, eff. January 1, 1992 (amending Ill.Rev.Stat.1991, ch. 38, par. 12-7.1). Thus, ancestry, gender, sexual orientation, and physical and mental disability were added to the statute as bases; and battery, aggravated assault, misdemeanor theft, misdemeanor damage to property, and criminal trespass to vehicle were also added. The increased penalty language of subparagraph (b) pertaining to commission of the offense as a participant in a mob action was also eliminated. Pub. Act 86-1418, eff. January 1, 1991 (amending Ill.Rev.Stat.1989, ch. 38, par. 12-7.1).
In 1993, disorderly conduct and telephone harassment were added as predicate offenses. Pub. Act 87-1048, eff. January 1, 1993 (amending 720 ILCS 5/12-7.1(a) (West 1992)). In 1994, the words "actual or perceived" were also inserted immediately before the group of classes by reason of which the hate crime occurred. Pub. Act 88-659, § 3, eff. September 16, 1994 (amending 720 ILCS 5/12-7.1(a) (West 1992)). Thus, at the time of the instant offense, in October 1994, sections 12-7.1(a) and (b) provided:
"Hate crime.
(a) A person commits hate crime when, by reason of the actual or perceived race, color, creed, religion, ancestry, gender, sexual orientation, physical or mental disability, or national origin of another individual or group of individuals, he commits assault, battery, aggravated assault, misdemeanor or theft, criminal trespass to residence, misdemeanor criminal damage to property, criminal trespass to vehicle, criminal trespass to real property, mob action or disorderly conduct as these crimes are defined in Sections 12-1, 12-2, 12-3, 16-1, 19-4, 21-1, 21-2, 21-3, 25-1, and 26-1 of this Code, respectively or harassment by telephone as defined in Section 1-1 of the Obscene Phone Call Act.
(b) Hate crime is a Class 4 felony for a first offense and a Class 2 felony for a second or subsequent offense." (Emphasis added.) 720 ILCS 5/12-7.1(a), (b) (West 1994).

ANALYSIS
The State claims that the courts below erred by incorrectly interpreting section 12-7.1(a) to require that the victim or complainant be or be perceived to be of one of the classes enumerated in the statute.
The State first argues that the plain language of the hate crime statute indicates a legislative intent that the focus of the provision be upon the accused's motive and conduct, and not upon the status or the perceived status of any victim or victims. Further, according to the State, the provision includes no language which directs or suggests that an accused's bias-motivated actions must be directed against even a particular victim in order for a hate crime to occur. The State claims that by inclusion of the phrase "actual or perceived," the legislature intended that a trier of fact focus not on the victim's status, but rather on the defendant's motivation which caused him to commit one of the predicate offenses listed by the statute.
*1359 Respondents maintain that a person cannot be a "victim" of a hate crime when the offender's improper bias in committing the underlying crime is not directed against that individual or the class to which he belongs. Thus, as applied to this case, James Jeffries cannot be the victim of a hate crime because the racially offensive materials were not directed against either him or his race.
The primary rule of statutory construction is to ascertain and give effect to the intention of the legislature, and that inquiry appropriately begins with the language of the statute. People v. Hare, 119 Ill.2d 441, 447, 116 Ill.Dec. 664, 519 N.E.2d 879 (1988). Where the language of a statute is clear and unambiguous, it will be given effect without resort to other aids for construction. Eagan v. Chicago Transit Authority, 158 Ill.2d 527, 199 Ill.Dec. 739, 634 N.E.2d 1093 (1994). However, where the meaning of a statute is unclear from the statutory language itself, a court may look beyond the language employed and consider the purpose of the law, the evils that law was designed to remedy (see In re Application for Judgment & Sale of Delinquent Properties for the Tax Year 1989, 167 Ill.2d 161, 212 Ill.Dec. 215, 656 N.E.2d 1049 (1995)), as well as legislative history to discern legislative intent (see People v. Jameson, 162 Ill.2d 282, 205 Ill.Dec. 90, 642 N.E.2d 1207 (1994)). In doing so, a court should presume that the legislature did not intend an absurdity, inconvenience or injustice. See Illinois Crime Investigating Comm'n v. Buccieri, 36 Ill.2d 556, 224 N.E.2d 236 (1967).
It is accepted that a statute is ambiguous, warranting consideration of other sources, when it is capable of being understood by reasonably well-informed persons in two or more different senses. Jameson, 162 Ill.2d at 288, 205 Ill.Dec. 90, 642 N.E.2d 1207.
The plain language of the hate crime statute states that the offense is committed when a person commits one of the underlying predicate offenses "by reason of the actual or perceived race * * * of another individual or group of individuals." 720 ILSC 5/12-7.1(a) (West 1994). The statute includes no expression that the victim or complainant of the underlying offense must be that individual or of that group of individuals. Inclusion of the phrase "actual or perceived" as a modifier of race and of the other enumerated classes indicates, however, that the race, color, religion, etc., of the individual or group that provides reason for the offense is capable of being perceived by an accused. This suggests that such individual has actual contact, or has had actual contact, at the least, with the accused so that his or her race, religion, etc., is perceivable. Nonetheless, it remains unclear from the statute's language whether such individual or individuals must necessarily be the victim or complainant of the underlying offense as opposed to being a person associating with the victim, a bystander, or a physically nearby, but more remote, individual. But see In re Vladimir P., 283 Ill.App.3d 1068, 219 Ill.Dec. 161, 670 N.E.2d 839 (1996). Considering the lack of clarity in this regard, we find the statute to be ambiguous. See Jameson, 162 Ill.2d at 288, 205 Ill.Dec. 90, 642 N.E.2d 1207. Accordingly, we must resort to other construction aids.
Respondents contend that the legislative history supports their position that the victim must belong to or be perceived to belong to the group against which the accused is biased. Respondents claim it is noteworthy that the hate crime statute was formerly entitled "Ethnic intimidation" (Ill.Rev.Stat. 1989, ch. 38, par. 12-7.1), and further claim that the basic elements of the offense have not subsequently changed, other than that the enumerated classes (and predicate offenses) have been expanded beyond ethnicity. Citing to the legislative debates, respondents also claim that the legislature chose to enhance the punishment for the predicate offenses underlying hate crimes because of the fact that defendants might choose their victims for "abhorrent" reasons. Cf. 82d Ill. Gen. Assem., Senate Proceedings, June 24, 1982, at 93; 82d Ill. Gen. Assem., House Proceedings, June 25, 1982, at 32.
We have reviewed the debates cited by respondents and do not find that the legislature contemplated penalty enhancement of the underlying offenses because of any improper motive in selecting victims. Neither are we persuaded by respondents' argument *1360 that the former "Ethnic intimidation" statute required that the victim necessarily be an individual from one of the enumerated classes, and, assuming that to be the case, that the basic statutory elements have remained the same with the expansion of classes and predicate offenses as well as the change of name.
In our view, the legislative history supports, instead, a generally more expansive meaning of the statute. During legislative debates surrounding passage of the hate crime statute, Representative Farley, the sponsor of the legislation, stated:
"This [b]ill is based on a premise that bias crimes have a more profound potential impact on our community than other crimes. It seems to me that there should be a loud and clear message out there in regard to hate crimes. These types of crimes can and would destroy the very fabric of our society." 87th Ill. Gen. Assem., House Proceedings, May 22, 1992, at 173-74.
The debates elsewhere reveal that the phrase "actual or perceived" was intended to foreclose the possibility that a hate crime perpetrator who had committed an underlying predicate offense against a person because of his or her religion, race, etc., might avoid conviction on the basis that the victim was not actually of the particular religion or race. 88th Ill. Gen. Assem., House Proceedings, April 20, 1993, at 168-71. These debates do not reveal, however, whether it is the victim's status, whether actual or perceived, that is determinative as a rule of a hate crime. Notably, the commentary also indicates, in general terms, that the primary focus of the statute was intended to be directed towards the biased motivation of the perpetrator, rather than towards the status of the victim. See 88th Ill. Gen. Assem., House Proceedings, April 20, 1993, at 171. In our view, it does not appear that the facts in the present case fall beyond the generally intended area of application for section 12-7.1(a).
The State asserts that section 5-5-3.2(a)(10) of the Unified Code of Corrections, a statutory aggravation factor available for criminal sentencing, presents an example of how the legislature might have included language intended to focus on a victim's status. 730 ILCS 5/5-5-3.2 (West 1994) ("defendant committed the offense against a person or a person's property by reason of the person's actual or perceived race, color" (emphasis added)). By contrast, the less restrictive language of the hate crime statute indicates that its focus is on whether the offender's bias towards certain stated groups motivated the alleged criminal conduct, regardless of whether the complainant was, or was perceived to be, a member, himself, of the particular group. In the State's view, where the legislature intends that the offender's bias be directed against a particular victim, it utilizes language to that effect as is shown by section 5-5-3.2. Because section 12-7.1(a) does not include such language, the legislature could not have intended such a requirement.
Respondents assert that the State's reliance on section 5-5-3.2 constitutes a distinction without a difference. That the sentencing factor provision refers to "person" and the hate crime statute refers to "individual" is not an indication that the hate crime statute does not require that a particular victim be the recipient of the offender's bias. Neither does this difference make the hate crime statute's language less restrictive.
Respondents' argument misses the point. Section 5-5-3.2(a)(10) does not simply utilize a different, but similar, term than the hate crime statute. The provision utilizes the same term, "person," in referring to both the victim and the one whose status provides reason for the offense. Moreover, the syntax within the sentencing factor provision makes clear that the two "persons" are one and the same. The existence of the sentencing factor's language makes clear that where the legislature intends that the bias-motivated conduct be directed against a particular victim, it is capable of doing so.
In addition, it is significant that the legislature enacted the "Institutional vandalism" statute (Ill.Rev.Stat.1983, ch. 38, par. 21-1.2) along with the hate crime statute. Like the hate crime statute, the institutional vandalism statute was also part of model legislation proposed to the states by the Anti-Defamation League that was intended to combat a rising tide of bias-motivated crimes against *1361 persons, institutions and property. The institutional vandalism statute provides in relevant part:
"A person commits institutional vandalism when, by reason of the actual or perceived race, color, creed, religion * * * of another individual or group of individuals, he * * * inflicts damage to any of the following properties:
* * * * * *
(3) A school, educational facility or community center;
(4) The grounds adjacent to, and owned or rented by, any institution, facility, building, structure * * * described [above]; or
(5) Any personal property contained in any institution, facility, building, structure * * * described [above]." (Emphasis added.) 720 ILCS 5/21-1.2(a)(3), (a)(4), (a)(5) (West 1994).
The institutional vandalism statute was amended in 1994 as part of the same act that amended the hate crime statute to include the phrase "actual or perceived." See Pub. Act 88-659, § 3, eff. September 16, 1994 (amending 720 ILCS 5/12-7.1(a) (West 1992)).
Consideration of this provision also makes clear that the victim of a hate crime need not be a member of one of the statute's enumerated classes providing reason for the offense. The hate crime statute and the vandalism provision both require the same motivational or intent element, and neither provision expresses that that motive necessarily be directed against the victim of the underlying offense. In the case of the institutional vandalism statute, however, there can be little doubt that a victim, for example, the owner of a vandalized school or the owner of personal property within such building, need not be the individual or a member of the group whose race, religion, etc., motivated the criminal act. To require such not only would constitute an overly restrictive interpretation of the statute, but would be absurd as well.
We find additional support for a less restrictive construction of the hate crime statute after considering the statutory elements of disorderly conduct (720 ILCS 5/26-1 (West 1994)) and mob action (720 ILCS 5/25-1 (West 1994)), two of the predicate offenses underlying the statute. The State argues that proof of disorderly conduct, the underlying offense with which respondents were charged, does not require proof that the offensive conduct be directed against a specific individual, i.e., a "victim" of the offense. See 720 ILCS 5/26-1(a)(1) (West 1994) (knowingly "[d]oes any act in such an unreasonable manner as to alarm or disturb another and to provoke a breach of the peace"). Respondents claim, however, that the word "another" within the disorderly conduct statute indicates that someone must be alarmed or disturbed by the accused's conduct. Consequently, the offense cannot be considered a victimless crime.
Though the phrase "as to alarm or disturb another" is included within the definition of disorderly conduct, the nature of the conduct is at issue in the case of this offense, rather than the extent to which the conduct is directed at any one particular individual. People v. Raby, 40 Ill.2d 392, 397, 240 N.E.2d 595 (1968), noted that the gist of disorderly conduct is "`not so much that a certain overt type of behavior was accomplished, as * * * that the offender knowingly engaged in some activity in an unreasonable manner which he knew or should have known would tend to disturb, alarm or provoke others. The emphasis is on the unreasonableness of the conduct and its tendency to disturb.'" Quoting Ill.Ann.Stat., ch. 38, par. 26-1, Committee Comments-1961 (Smith-Hurd).
In Raby, the court affirmed the disorderly conduct conviction of Al Raby, a civil rights activist, based on charges that he and others sat, during the 5 p.m. rush hour, in the intersection of LaSalle and Randolph Streets in Chicago and refused to leave despite several requests by police. Similarly, in People v. Stiso, 93 Ill.App.3d 101, 48 Ill.Dec. 687, 416 N.E.2d 1209 (1981), the court upheld a disorderly conduct conviction based on charges that the defendant barred patients' access to an abortion surgery room and refused to leave when requested. Neither of these cases represented instances where a particular individual was aggrieved or offended by the defendant's conduct, but concerned disturbance *1362 to the general public or persons present in the general sense.
Furthermore, when analyzing claims of insufficiency of evidence to support disorderly conduct, reviewing courts often focus their analysis on the unreasonableness of the conduct and treat the person offended by the conduct as a "complainant" rather than a "victim." See People v. Albert, 243 Ill. App.3d 23, 27, 183 Ill.Dec. 304, 611 N.E.2d 567 (1993) (defendant knew or should have known noise would disturb people such as "complainant"); People v. Duncan, 259 Ill. App.3d 308, 197 Ill.Dec. 581, 631 N.E.2d 803 (1994) (public urination sufficient to sustain conviction for disorderly conduct where conduct was done in such an unreasonable manner as to alarm and disturb another); People v. Bergeson, 255 Ill.App.3d 601, 604-05, 194 Ill.Dec. 292, 627 N.E.2d 408 (1994). Clearly, while a complainant provides evidence that a defendant's conduct is unreasonable to "another," the complainant need not be someone against whom the defendant has directed his conduct.
Similarly, the mob action statute is defined as "[t]he use of force or violence [which] disturb[s] the public peace by 2 or more persons acting together and without authority of law." 720 ILCS 5/25-1(a) (West 1994). To sustain a conviction for mob action it must be shown that a defendant was part of a group engaged in physical aggression reasonably capable of inspiring fear of injury or harm. People v. Simpkins, 48 Ill.2d 106, 109, 268 N.E.2d 386 (1971). In Simpkins, mob action convictions were upheld based on charges that the defendants were among a group of teenagers, one of whom possessed a recently discharged revolver, shortly after police heard several shots and saw two groups of teenagers running in opposite directions.
Thus, in some instances, where disorderly conduct or mob action constitutes the predicate offense for a hate crime, there might not exist a particular aggrieved or offended person because these offenses may be committed by unreasonably affronting the public at large. This fact provides additional support for the interpretation of the hate crime statute urged by the State.
Moreover, we agree with the State that when a disorderly conduct charge is heightened to the offense of a hate crime by virtue of a biased motivation for the conduct, the State's burden of proof should not increase to require proof of the existence of a particular individual against whom the alleged conduct is directed. By dismissing the charges on the basis that the named complainant, James Jeffries, was not an African-American, the type of person against whom respondents' racial bias was directed, the trial court, in effect, held that the State was required to prove that the offensive conduct was directed against a specific person. As shown, proof of such element is not necessary for proof of disorderly conduct.
Finally, section 12-7.1(a) must be interpreted in a manner that avoids absurd, unjust, unreasonable or inconvenient results which could not have been intended by the legislature. See People v. Stanciel, 153 Ill.2d 218, 233-34, 180 Ill.Dec. 124, 606 N.E.2d 1201 (1992). Accepting the respondents' interpretation results, for example, in the inability of a Caucasian person who is not perceived as, but associates or socializes with, African-Americans to maintain a charge against a defendant who admittedly burns a cross on that person's property because of racial animosity directed against the person's associates. Similarly, a defendant professing hatred against homosexuals might bomb a "gay" bar which causes injury, by happenstance, to only heterosexual patrons of the bar as well as the bar's heterosexual owner, and avoid prosecution under the hate crime statute. Likewise, a defendant professing hatred against Jewish persons might physically assault a person who, though not Jewish or perceived to be Jewish by the defendant, is engaged in demonstrating against the desecration of synagogues. This defendant, also, would avoid prosecution under respondents' interpretation of the hate crime statute.
In each of these instances, individual persons, but more importantly our entire community, are harmed by a defendant's bias-motivated criminal conduct. We conclude that the legislature, aware of this fact, intended that improper bias which motivates *1363 certain criminal acts be the component which elevates the conduct to the level of hate crime, rather than merely the status of a particular victim. There is no indication that the legislature intended only to redress the narrower wrong caused by biased selection of victims. Cf. Wang Lu-in, Hate Crimes Law § 10.04(3) (1996) (categorizing the Illinois hate crime statute as among statutes capable of broader construction).
Although ambiguous penal statutes should be construed to afford lenity to the accused (see People v. Foster, 99 Ill.2d 48, 55, 75 Ill.Dec. 411, 457 N.E.2d 405 (1983)), such rule does not justify the failure to apply a criminal statute where the legislature clearly intended its application (People v. Hicks, 164 Ill.2d 218, 222, 207 Ill.Dec. 295, 647 N.E.2d 257 (1995)). In the case of section 12-7.1(a), we find the legislature intended that it be applicable to the facts presented by the instant charge. Accordingly, we hold that section 12-7.1(a) does not require as an element that the victim be an individual or of the group of individuals whose class provides reason for the underlying criminal offense.
Respondents yet maintain that regardless of how the hate crime statute is interpreted, dismissal of the petitions may be sustained on the basis that the petitions and stipulation were insufficient to state disorderly conduct. According to respondents, the petitions and stipulations showed that, at most, they "peacefully expressed unpopular views."
A charge of disorderly conduct requires a showing that the accused knowingly acted in such an unreasonable manner as to alarm or disturb another and to provoke a breach of the peace. 720 ILCS 5/26-1 (West 1994). The offense embraces a wide variety of conduct serving to destroy or menace the public order and tranquility. The offense may include not only violent acts, but acts and words likely to produce violence in others. City of Chicago v. Wender, 46 Ill.2d 20, 262 N.E.2d 470 (1970). The "type of conduct alone is not determinative, but rather culpability is equally dependent upon the surrounding circumstances." 720 ILCS 5/26-1, Committee Comments1961, at 337 (Smith-Hurd 1993).
In the present case, the amended petitions alleged in relevant part that respondents "knowingly committed the offense of disorderly conduct in that respondents displayed patently offensive depictions of violence toward African-Americans in such an unreasonable manner as to alarm and disturb James Jeffries and provoke a breach of the peace" in violation of the hate crime statute. These depictions were confiscated from respondents and subsequently admitted during hearing on the motion to dismiss.
The alleged depictions consisted of a hand drawing of an eerily smiling, hooded Ku Klux Klansman who held an axe-like object from which drops of blood apparently fell. At the Klansman's feet lay the prone body of a dark complexioned person, whose groin was disfigured and darkened. Beneath the person's body' and head were two connected, dark, oblong shapes that apparently represented pools of blood. Five swastikas appeared beneath the scene. The Klansman's robe bore the statement, "White power Hitler rules." The following riddle was written alongside the Klansman figure. "[H]ey you take a niger [sic] and chomp off his dk & his fingers and stike [sic] it up his a and then stike [sic] it throgh [sic] is [sic] head. And [w]hat do [you] get. One [d]ead niger [sic] and a lot of blood." See Appendix. Several other hooded Ku Klux Klansmen were also depicted, one of whom was armed with a knife and apparently displaying his extended middle finger. Apparent gang symbols stated "Supreme White Power," and one hooded Klansman appeared before the statement, "The original Boyz in the Hood." The petitions alleged that several African-Americans were present when these depictions were displayed by respondents to Jeffries.
We find that the petitions and stipulations sufficiently set forth charges of disorderly conduct against respondents by alleging that they displayed certain patently offensive depictions of violence toward African-Americans that disturbed an individual and provoked a breach of the peace. See 725 ILCS 5/111-3(a) (West 1994). Respondents were sufficiently apprised thereby of the charges against them. By our holding, we do not preclude respondents from asserting any defenses *1364 or constitutional challenges that may arise from the application of the hate crime statute to the particular circumstances of the case. At this early procedural stage, we have insufficient information upon which to determine whether first amendment concerns may be implicated by a criminal prosecution based entirely upon the display of a written and drawn depiction. Accordingly, we simply uphold the sufficiency of the charging instruments to state an offense of hate crime based on disorderly conduct.

CONCLUSION
Accordingly, we reverse the judgments of the appellate and circuit courts and remand this cause to the circuit court for further proceedings consistent with this opinion.
Judgments reversed; cause remanded.
Justice BILANDIC, dissenting:
I agree with my colleague, Justice Nickels, that the language of the Hate Crime Act plainly requires that the victim or victims of a hate crime be members of a protected class or perceived to be members of a protected class. Thus, I would affirm the trial court's dismissal of the State's petitions on that ground. Having resolved the case in this manner, I find it unnecessary to address whether any first amendment concerns would be implicated by the prosecutions in this case.
Justice HEIPLE, also dissenting:
The petitions filed by the State in this case charged respondents with committing hate crime (720 ILCS 5/12-7.1 (West 1994)) based on disorderly conduct (720 ILCS 5/26-1 (West 1994)) in that respondents "displayed patently offensive depictions of violence toward African-Americans." I wholeheartedly agree with the State that the children's pencil sketches are patently offensive. Because I believe, however, that a recent decision by the United States Supreme Court conclusively prohibits the State from punishing respondents under the Illinois hate crime statute for displaying these patently offensive depictions, I would affirm the circuit court's dismissal of the charges.
The circuit court dismissed the charges of hate crime because the alleged victim of the crime is not a member of the African-American race. The question before a reviewing court, however, is the correctness of the result reached by the lower court and not the correctness of the reasoning upon which that result was reached. People v. Novak, 163 Ill.2d 93, 101, 205 Ill.Dec. 471, 643 N.E.2d 762 (1994). Therefore, as a reviewing court, we can sustain the decision of a lower court for any appropriate reason, regardless of whether the lower court relied on those grounds and regardless of whether the lower court's reasoning was correct. Novak, 163 Ill.2d at 101, 205 Ill.Dec. 471, 643 N.E.2d 762.
In R.A.V. v. City of St. Paul, 505 U.S. 377, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992), the United States Supreme Court sustained a Minnesota trial court's dismissal of a petition which charged a minor with violating St. Paul's Bias-Motivated Crime Ordinance. That ordinance provided as follows:
"`Whoever places on public or private property a symbol, object, appellation, characterization or graffiti, including, but not limited to, a burning cross or Nazi swastika, which one knows or has reasonable grounds to know arouses anger, alarm or resentment in others on the basis of race, color, creed, religion or gender commits disorderly conduct and shall be guilty of a misdemeanor.'" R.A.V., 505 U.S. at 380, 112 S.Ct. at 2541, 120 L.Ed.2d at 315, quoting St. Paul, Minn., Legis. Code § 292.02 (1990).
The minor in R.A.V. allegedly burned a cross in the front yard of a black family's home. R.A.V., 505 U.S. at 379, 112 S.Ct. at 2541, 120 L.Ed.2d at 315. The trial court ruled that the Bias-Motivated Crime Ordinance was substantially overbroad and impermissibly content based, and therefore facially invalid under the first amendment. R.A.V., 505 U.S. at 380, 112 S.Ct. at 2541, 120 L.Ed.2d at 315. The Minnesota Supreme Court reversed, holding that the ordinance regulated only "fighting words," which the first amendment does not protect, and was a narrowly tailored means toward accomplishing a compelling governmental interest. In re Welfare of R.A.V., 464 N.W.2d 507, 510-11 (Minn.1991).
*1365 The United States Supreme Court reversed, ruling that the minor could not be punished under the St. Paul ordinance. R.A.V., 505 U.S. at 396, 112 S.Ct. at 2550, 120 L.Ed.2d at 326. The Court declared the ordinance facially unconstitutional because it prohibited "otherwise permitted speech solely on the basis of the subjects the speech addresses." R.A.V., 505 U.S. at 381, 112 S.Ct. at 2542, 120 L.Ed.2d at 316. The Court accepted, arguendo, the Minnesota Supreme Court's construction of the statute as proscribing only fighting words, but held that nevertheless "government may not regulate [the] use [of fighting words] based on hostility-or favoritism-towards the underlying message expressed." R.A.V., 505 U.S. at 386, 112 S.Ct. at 2545, 120 L.Ed.2d at 320. The Court held that because "the ordinance applies only to `fighting words' that insult, or provoke violence, `on the basis of race, color, creed, religion or gender,'" it constituted impermissible "content discrimination." R.A.V., 505 U.S. at 391, 112 S.Ct. at 2547, 120 L.Ed.2d at 323. According to the Court, "[t]he First Amendment does not permit [the state] to impose special prohibitions on those speakers who express views on disfavored subjects." R.A.V., 505 U.S. at 391, 112 S.Ct. at 2547, 120 L.Ed.2d at 323. The Court therefore ruled that the minor could not be prosecuted for disorderly conduct based on violation of the Bias-Motivated Crime Ordinance.
I believe it obvious that, as applied to the facts of the instant case, the Supreme Court's decision in R.A.V. conclusively prohibits the State from prosecuting respondents based on the allegations of the instant petitions, though not because the Illinois hate crime statute (720 ILCS 5/12-7.1 (West 1994)) is unconstitutional on its face, as the St. Paul ordinance was. The Supreme Court, less than a year after deciding R.A.V., sustained the validity of a Wisconsin law which, like the Illinois statute, punishes persons who commit crimes based on discriminatory motives. Wisconsin v. Mitchell, 508 U.S. 476, 480, 113 S.Ct. 2194, 2197, 124 L.Ed.2d 436, 442 (1993) (upholding an increase in penalty for persons convicted of certain crimes if the person intentionally selected his victim because of the victim's race, religion, color, disability, sexual orientation, national origin or ancestry). The trial court in Mitchell increased defendant's aggravated battery sentence after finding that he selected his victim based on the victim's race. The Supreme Court held that the Wisconsin statute, unlike the St. Paul ordinance in R.A.V., is aimed not at speech but rather at "conduct unprotected by the First Amendment," i.e., selecting a person against whom a crime is committed. Mitchell, 508 U.S. at 487, 113 S.Ct. at 2201, 124 L.Ed.2d at 447. As the majority in the instant case correctly observes, the Illinois hate crime statute similarly imposes punishment for committing a crime because of a person's race. In this sense, it is identical to the Wisconsin measure which the Supreme Court held to be facially valid under the first amendment.
Although section 12-7.1 of the Criminal Code (720 ILCS 5/12-7.1 (West 1994)) is thus not facially unconstitutional, I believe R.A.V. clearly dictates that the statute is unconstitutional as applied to respondents' conduct in the instant case. The St. Paul ordinance struck down in R.A.V. provided that a person commits disorderly conduct when he "`places on public or private property a symbol * * * which [he] knows or has reasonable grounds to know arouses anger, alarm or resentment in others on the basis of race.'" R.A.V., 505 U.S. at 380, 112 S.Ct. at 2541, 120 L.Ed.2d at 315, quoting St. Paul, Minn., Legis. Code § 292.02 (1990). The Illinois hate crime statute under which respondents are charged punishes disorderly conduct committed "by reason of the actual or perceived race * * * of another individual or group of individuals." 720 ILCS 5/12-7.1(a) (West 1994). In Illinois, a person commits disorderly conduct when he "knowingly * * * [d]oes any act in such unreasonable manner as to alarm or disturb another and to provoke a breach of the peace." 720 ILCS 5/26-1 (West 1994). The petitions in the instant case charged that respondents committed disorderly conduct in that they "displayed patently offensive depictions of violence toward African-Americans."
I believe that the conduct described in the petitions falls squarely within that class of expression which the Supreme Court has declared *1366 "government may not regulate * * * based on hostility-or favoritism-towards the underlying message expressed." R.A.V., 505 U.S. at 386, 112 S.Ct. at 2545, 120 L.Ed.2d at 320. The allegedly criminal conduct charged is the display of depictions of violence toward African-Americans. Punishing respondents for this conduct under the hate crime statute, however, clearly violates R.A.V.'s holding that government may not silence "otherwise permitted speech solely on the basis of the subjects the speech addresses." R.A.V., 505 U.S. at 381, 112 S.Ct. at 2542, 120 L.Ed.2d at 316. Although the petitions allege that respondents' display of the depictions constituted disorderly conduct, the allegations of disorderly conduct in this case, just as in R.A.V., are based solely on the charge that the patently offensive depictions were intended to alarm or disturb by reason of race. R.A.V., 505 U.S. at 391, 112 S.Ct. at 2547, 120 L.Ed.2d at 323. I believe R.A.V. dictates that the State's use of the hate crime statute in the instant case to punish the display of depictions "that insult, or provoke violence, `on the basis of race'" constitutes impermissible "content discrimination" under the first amendment. R.A.V., 505 U.S. at 391, 112 S.Ct. at 2547, 120 L.Ed.2d at 323.
Respondents contend, both in their brief and in oral argument, that the petitions allege only that they "peacefully expressed unpopular views," behavior which this court has held may not be punished under the guise of a disorderly conduct charge. City of Chicago v. Meyer, 44 Ill.2d 1, 4, 253 N.E.2d 400 (1969); People v. Raby, 40 Ill.2d 392, 397, 240 N.E.2d 595 (1968). The majority's sole response to this contention is that currently there is "insufficient information upon which to determine whether first amendment concerns may be implicated by a criminal prosecution based entirely upon the display of a written and drawn depiction." 176 Ill.2d at 553, 223 Ill.Dec. at 928, 680 N.E.2d at 1364. I believe that no factual information whatsoever is required to answer this question as framed by the majority. Rather, it is a question of law, the answer to which is that the first amendment, as interpreted by the Supreme Court in R.A.V., conclusively prohibits a hate crime prosecution based entirely upon the display of a written and drawn depiction. Moreover, that the record in this case is exceedingly sparse, revealing almost nothing about the circumstances of the alleged offense, is not respondents' fault. It is the State's burden to file a charging instrument which is legally sufficient to allege commission of an offense. 725 ILCS 5/111-3(a) (West 1994). The State failed to do so in this case, because all of the conduct described in the petitions is protected by the United States Constitution from punishment under the Illinois hate crime statute.
For this reason, and notwithstanding the patently offensive nature of the drawings, I respectfully dissent.
Justice NICKELS, also dissenting:
The hate crime statute provides that a hate crime offense is committed where a person commits one of the listed predicate offenses "by reason of the actual or perceived race * * * of another individual or group of individuals." 720 ILCS 5/12-7.1 (West 1994). I must first agree with the conclusion reached by the trial and appellate courts, finding that this language requires that the victim or victims of a hate crime be members of a protected class or perceived to be members of a protected class. More importantly, I believe that the respondents may not constitutionally be charged with the predicate offense of disorderly conduct for displaying a drawing, despite its offensive character. Therefore, I respectfully dissent.

I. STATUTORY CONSTRUCTION
The legislature specifically amended the hate crime statute to include the words "actual or perceived" so that it would reach instances where the perpetrator "perceived" the victim to be of a protected class, even if that perception is incorrect. Representative Schakowsky described the purpose of the amendment during debates in the House:
"House Bill 1356 amends the ... Hate Crimes Act * * * by adding only three words, and those words are `actual or perceived'. And this is to make sure that people who are the victims of a hate crime who aren't actually the person that the ... perpetrator thought they were ([t]hat is if *1367 someone were beaten up because he or she was perceived to be Jewish and that person wasn't, if he or she were perceived to be Japanese and was really Korean), that the perpetrator of that crime would still be guilty and couldn't use as an escape the fact that the victim wasn't who he thought he was." (Emphasis added.) 88th Ill. Gen. Assem., House Proceedings, April 20, 1993, at 167-68.
If the victim does not have to be a member of a protected class, then the legislature would not have needed to amend the statute to include this language because the status of the victim would not be at issue.
The majority determines that the "actual or perceived" language is ambiguous and requires judicial construction. With due respect, it sounds as if the plain language of the statute was subjected to judicial deconstruction:
"Inclusion of the phrase `actual or perceived' as a modifier of race and of the other enumerated classes indicates, however, that the race, color, religion, etc., of the individual or group that provides reason for the offense is capable of being perceived by an accused. This suggests that such individual has actual contact, or has had actual contact, at the least, with the accused so that his or her race, religion, etc., is perceivable." 176 Ill.2d at 543, 223 Ill.Dec. at 923, 680 N.E.2d at 1359.
I do not agree that the words "actual or perceived" were really intended by the legislature to ensure that the protected class of some individual who may not be the victim "is capable of being perceived." I am not even exactly sure what that means.
The majority also reasons that it is within the purpose of the hate crime statute to punish a perpetrator who selects a victim because of the victim's support of or association with some protected class. I wholeheartedly agree that the statute should be drafted to include these situations as a matter of good public policy. However, the statute as written does not reach these circumstances and any such change in the statute must come from the legislature, not this court. I will not judicially rewrite the statute under the guise of statutory construction.
Furthermore, I am constrained by law to interpret criminal statutes in a lenient manner. People ex rel. Gibson v. Cannon, 65 Ill.2d 366, 370-71, 2 Ill.Dec. 737, 357 N.E.2d 1180 (1976). Where a criminal statute is capable of two constructions, the one that operates in favor of the accused is to be adopted. Gibson, 65 Ill.2d at 371, 2 Ill.Dec. 737, 357 N.E.2d 1180. Therefore, I would hold that the hate crime statute requires that the victim be a member of a protected class or perceived to be a member of a protected class. It is simply too great of a stretch for me to ascribe any other meaning to the "actual or perceived" language in the hate crime statute.

II. FIRST AMENDMENT ISSUES
The delinquency petitions alleged that the respondents committed the predicate offense of disorderly conduct in that they "displayed patently offensive depictions of violence toward African-Americans in such an unreasonable manner as to disturb James Jeffries and provoke a breach of the peace." I believe that respondents' conduct cannot be charged as the predicate offense of disorderly conduct without violating first amendment principles, which are applicable to the states under the fourteenth amendment. U.S. Const., amends. I, XIV. Therefore, I believe that the majority errs in stating that the "petitions and stipulations sufficiently set forth charges of disorderly conduct." 176 Ill.2d at 553, 223 Ill.Dec. at 927, 680 N.E.2d at 1363.

A. The Drawing is Speech
The charged conduct of "displaying" the drawing qualifies as speech under the first amendment. In Cohen v. California, 403 U.S. 15, 16, 91 S.Ct. 1780, 1784, 29 L.Ed.2d 284, 289 (1971), the United States Supreme Court reviewed the conviction of a war protester who wore a jacket to court embossed with the statement "Futhe draft." The protester was convicted of breaching the peace for his conduct "`which has a tendency to provoke others to acts of violence or to in turn disturb the peace' * * * [citation]." (Emphasis in original.) Cohen, 403 U.S. at 17, 91 S.Ct. at 1784, 29 L.Ed.2d at 289. In *1368 reversing the conviction, the Court found that the defendant's conduct of displaying his message constituted speech protected by the first amendment:
"The conviction quite clearly rests upon the asserted offensiveness of the words [defendant] used to convey his message to the public. The only `conduct' which the State sought to punish is the fact of communication. Thus, we deal here with a conviction resting solely upon `speech,' [citation] * * *." (Emphasis in original.) Cohen, 403 U.S. at 18, 91 S.Ct. at 1784, 29 L.Ed.2d at 290.
Similarly, I believe that respondents' conduct in displaying the drawings constitutes speech. The only conduct the State sought to charge is the fact of a racially offensive communication.
Moreover, this is not a case where there is some nonspeech element of the respondents' conduct that could be separately regulated where there is a sufficiently important governmental interest at stake. Cf United States v. O'Brien, 391 U.S. 367, 376, 88 S.Ct. 1673, 1678-79, 20 L.Ed.2d 672, 679-80 (1968) (finding that burning draft cards may be regulated because "when `speech' and `nonspeech' elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms"). Thus, the charge of disorderly conduct must come under some exception to the protection afforded speech under the first amendment such as obscenity, incitement to imminent violence or fighting words.

B. Obscenity
Generally, obscene material is not protected by the first amendment. Roth v. United States, 354 U.S. 476, 485, 77 S.Ct. 1304, 1309, 1 L.Ed.2d 1498, 1507 (1957). Obscene material is that which deals with sex in a manner appealing to prurient interest. Roth, 354 U.S. at 487, 77 S.Ct. at 1310, 1 L.Ed.2d at 1508. Respondents' drawings were not obscene.

C. Incitement to Violence
The charge of disorderly conduct also does not pass constitutional scrutiny on the basis that the drawings depict or advocate violence. In Brandenburg v. Ohio, 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969) (per curiam), the United States Supreme Court reversed a Ku Klux Klan leader's criminal conviction for advocating violence. The Supreme Court held that the state may not "forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." (Emphasis added.) Brandenburg, 395 U.S. at 447, 89 S.Ct. at 1829, 23 L.Ed.2d at 434. The Court struck down the Ohio statute because it was not narrowly drawn to distinguish between the advocacy of a theory of violence and the advocacy of immediate lawless action.
The respondents' display of the drawings was not a direction to imminent violent behavior. Cf. Feiner v. New York, 340 U.S. 315, 71 S.Ct. 303, 95 L.Ed. 295 (1951) (inciting crowd to riot not protected by the first amendment). In addition, the disorderly conduct statute is not narrowly drafted to reach such circumstances. Therefore, the violent content of the drawings may not, consistent with the first amendment, serve as a basis for the charge of disorderly conduct.

D. Fighting Words
The reason that fighting words are excluded from the protection of the first amendment is because such words constitute a nonspeech element of communication. R.A.V. v. City of St. Paul, 505 U.S. 377, 386, 112 S.Ct. 2538, 2545, 120 L.Ed.2d 305, 319 (1992). This small class of fighting words is considered to provoke the average person to fisticuffs and thereby cause a breach of the peace. Chaplinsky v. New Hampshire, 315 U.S. 568, 572, 62 S.Ct. 766, 769, 86 L.Ed. 1031, 1035 (1942). Thus, fighting words are categorically excluded from first amendment protection because they constitute an intolerable mode of expressing whatever idea the speaker wishes to convey. R.A.V., 505 U.S. at 393, 112 S.Ct. at 2548-49, 120 L.Ed.2d at 324.
The Supreme Court has carefully limited the reach of disorderly conduct statutes in the area of fighting words because of the danger that such statutes may be used to *1369 suppress disfavored speech. Disorderly conduct statutes must be narrowly drawn or construed so that the statutes do not reach protected speech. If a disorderly conduct statute is not limited on its face or by judicial construction as applying only to "fighting words," then the statute is overbroad and unconstitutional. Gooding v. Wilson, 405 U.S. 518, 521, 92 S.Ct. 1103, 1105, 31 L.Ed.2d 408, 413 (1972). Furthermore, even if a defendant's conduct clearly involves fighting words he or she may still challenge a statute that is not properly limited on its face or by judicial construction to only fighting words. Plummer v. Columbus, 414 U.S. 2, 3, 94 S.Ct. 17, 18, 38 L.Ed.2d 3, 5 (1973); Lewis v. City of New Orleans, 415 U.S. 130, 133-34, 94 S.Ct. 970, 972-73, 39 L.Ed.2d 214, 219 (1974).
The United States Supreme Court has defined fighting words as direct personal insults. In Cantwell v. Connecticut, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940), the Supreme Court reversed a breach of peace conviction against an individual who played a phonograph record in public attacking the Catholic religion in front of Catholics who had gathered. The Court recognized that the state may constitutionally punish a speaker for breaching the peace where the speaker's remarks constitute "profane, indecent or abusive remarks directed to the person of the hearer" because "personal abuse is not in any proper sense communication of information or opinion safeguarded by the Constitution." Cantwell, 310 U.S. at 309-10, 60 S.Ct. at 906, 84 L.Ed. at 1221. However, the general attack on the Catholic religion did not constitute personal abuse of any member of the audience. Therefore, the Court found that the speech was protected by the first amendment.
As stated above, in Cohen v. California, 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971), the Supreme Court similarly reversed a defendant's disturbing the peace conviction for displaying the words "Futhe Draft" on a jacket worn to court. The Court found that although the display used vulgar language and contained political expression that some may find offensive, it did not constitute fighting words. The Court reasoned that the display did not constitute personally abusive epithets which are "`directed to the person of the hearer.'" Cohen, 403 U.S. at 20, 91 S.Ct. at 1785-86, 29 L.Ed.2d at 291, quoting Cantwell, 310 U.S. at 309, 60 S.Ct. at 906, 84 L.Ed. at 1221.
The drawings at issue in the instant case were not personally abusive epithets directed to the person of the hearer. Therefore, respondents may not be charged with disorderly conduct on the basis that the display of the drawings constituted fighting words.

E. Audience Reaction and Vagueness
Respondents' charge of disorderly conduct cannot rest simply on the fact that the speech "disturbed an individual and provoked a breach of the peace." 176 Ill.2d at 553, 223 Ill.Dec. at 927, 680 N.E.2d at 1363. In Ashton v. Kentucky, 384 U.S. 195, 86 S.Ct. 1407, 16 L.Ed.2d 469 (1966), the Supreme Court reversed a conviction under libel law making it an offense to circulate "`any writing calculated to create disturbances of the peace.'" Ashton, 384 U.S. at 198, 86 S.Ct. at 1409, 16 L.Ed.2d at 471. The Court found this standard too vague because it requires an individual to calculate the "boiling point" of a particular person or group. Ashton, 384 U.S. at 200, 86 S.Ct. at 1410, 16 L.Ed.2d at 472-73. The Court also reasoned that such a standard makes it a crime simply because others have no self-control and cannot refrain from violence. Ashton, 384 U.S. at 200, 86 S.Ct. at 1410, 16 L.Ed.2d at 473.
Moreover, the Supreme Court has specifically held that the expression of racist views may not be charged as a breach of the peace based on the reaction the views provoke. In Terminiello v. City of Chicago, 337 U.S. 1, 69 S.Ct. 894, 93 L.Ed. 1131 (1949), the defendant was convicted under a breach of the peace ordinance for giving a speech railing against religious and racial minorities to a howling crowd. The jury was instructed that it could convict defendant under the ordinance for conduct that "`stirs the public to anger, invites dispute, brings about a condition of unrest or creates a disturbance.'" Terminiello, 337 U.S. at 4, 69 S.Ct. at 895, 93 L.Ed. at 1134. In striking down the statute as vague and overbroad, the Supreme Court stated:

*1370 "[A] function of free speech under our form of government is to invite dispute. It may indeed best serve its highest purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger. Speech is often provocative and challenging. It may strike at prejudices and preconceptions and may have profound unsettling effects as it presses for acceptance of an idea. That is why freedom of speech, though not absolute, [citation] is nevertheless protected * * *. There is no room under our Constitution for a more restrictive view. For the alternative would lead to standardization of ideas either by legislatures, courts, or dominant political or community groups." Terminiello, 337 U.S. at 4-5, 69 S.Ct. at 896, 93 L.Ed. at 1134-35.
Thus, the disorderly conduct charges here at issue cannot be upheld based merely on the fact that the content of respondents' speech disturbed the victim. See also Texas v. Johnson, 491 U.S. 397, 408-10, 109 S.Ct. 2533, 2542-43, 105 L.Ed.2d 342, 356-57 (1989) (rejecting contention that flag burning can be banned because of State's claim that such expression is offensive to some and may cause a breach of the peace).

F. Insufficiency of Disorderly Conduct Charge
For these reasons, I would find that the display of the drawings is speech. I would further find that the disorderly conduct statute reaches only speech that amounts to fighting words or the incitement to riot. With this interpretation, the disorderly conduct statute does not reach speech protected by the first amendment and it is therefore not overbroad or vague. As the display of respondents' drawings does not constitute fighting words or the incitement to riot, I would find that respondents may not be charged with the predicate offense of disorderly conduct.

CONCLUSION
Cases such as this are often difficult. However, it is the protection of such expression that is the price that must be paid to secure the blessings of freedom of speech guaranteed by the first amendment. It is my solemn judicial responsibility to uphold in principle what I cannot defend in application. I would affirm the dismissal of the petitions.
*1371