2020 IL App (2d) 171008-U
No. 2-17-1008
Order filed February 24, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Lake County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 17-CF-1692 |
| NATHANIEL C. EPPS, | ) ) ) | Honorable Daniel B. Shanes, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE SCHOSTOK delivered the judgment of the court.
Justices Jorgensen and Burke concurred in the judgment.

**ORDER**

¶ 1   *Held*:   The State proved defendant guilty beyond a reasonable doubt of aggravated resisting a peace officer and disorderly conduct, as the jury could infer that defendant's resistance was the proximate cause of the police officer's injury and that defendant's entry of a stranger's vehicle and threat to kill him would tend to alarm or disturb a reasonable person, even though the victim testified that he did not take the threat seriously.

¶ 2   Following a jury trial, defendant, Nathaniel C. Epps, was convicted of aggravated resisting a peace officer (720 ILCS 5/31-1(a-7) (West 2016)) and disorderly conduct (720 ILCS 5/26-1(a)(1) (West 2016)).  The resisting offense was enhanced because an officer was injured while forcibly arresting defendant.  Defendant appeals, contending that he was not proved guilty beyond a

reasonable doubt of (1) aggravated resisting a peace officer because the officer's injuries resulted solely from his decision to use excessive force in making the arrest; and (2) disorderly conduct because the only witness to defendant's conduct testified that he was not alarmed or disturbed by it. We affirm.

¶ 3                                I. BACKGROUND

¶ 4       At trial, Joshua Holmgren testified that on June 19, 2017, he was working construction at the Grays Pointe apartment complex. He was in one of the garages gathering materials and placing them in his van when defendant approached him. Defendant informed him that the devil had told him to kill Holmgren. Holmgren continued gathering the materials.

¶ 5       Asked why he was not bothered by defendant's behavior, Holmgren said, "It just didn't seem serious. He didn't seem serious. I didn't really feel threatened by it."

¶ 6       At one point, defendant got into the driver's seat of Holmgren's van and said that he was going to take it. Holmgren reached in through the window and took the keys out of the ignition.

¶ 7       Defendant returned to the front of the garage, listening to music on his phone. He removed Holmgren's Bluetooth headset, saying that the devil had told him to kill Holmgren because of his tattoos. Holmgren retrieved the headphones and put them on so he could continue a conversation with his boss.

¶ 8       Holmgren said that he had been convicted of burglary and theft in Wisconsin. While in prison, he developed the attitude of not responding to verbal threats, as escalating the situation might lead to more trouble.

¶ 9       Holmgren kept a short two-by-four with him in case he needed to defend himself. As he finished loading the materials, defendant attempted to block him from entering the van, so Holmgren told his boss to call for help "[j]ust in case."

¶ 10    Several maintenance people arrived to see what was going on.  Shortly thereafter, property manager Lisa Johnson and a police officer arrived.  Holmgren told them that defendant was threatening him and would not let him leave.

¶ 11    Defendant started to walk away.  The officer told defendant to stop, but defendant did not respond except to say that he needed to use the restroom.  The officer told defendant that he needed to talk to him and said that he was under arrest.  The officer grabbed defendant's wrist and attempted to handcuff him.  Defendant pulled away and would not allow himself to be handcuffed.  The officer "ended up having to slam [defendant] on the ground."  Defendant still refused to be handcuffed, pushing and pulling away from the officer.  Another officer arrived, and they handcuffed defendant.

¶ 12    Grayslake police officer Eric McNeil testified that he responded to a report that an intoxicated male was harassing and threatening workers.  As he drove up, Holmgren flagged him down and, pointing toward defendant, said that defendant had threatened to kill him.

¶ 13    As McNeil exited his squad car to speak with defendant, Johnson arrived in a golf cart and said that she wanted defendant removed from the property.  McNeil asked defendant why he was bothering people.  Defendant responded, " 'I have to take a ***.' "

¶ 14    McNeil said, " 'I don't understand what that has to do with anything.' "  Defendant repeated that he had to defecate and started walking away.  McNeil told defendant to put his hands behind his back.  McNeil took out his handcuffs to arrest defendant.

¶ 15    Defendant walked back toward McNeil, who told him to turn around and put his hands behind his back.  McNeil reached for defendant's left arm, but he pulled away.  McNeil grabbed his arm and told him to put his hands behind his back.  Defendant pulled away again, but this time McNeil maintained his grip.

¶ 16    Defendant tried to walk past McNeil, pulling away twice.  McNeil told defendant three times that he was under arrest and threatened to tase him if he did not put his hands behind his back.  Defendant continued to pull away and walk toward the back of the squad car.  McNeil tried to pin him against the side of the car but could not.

¶ 17    After they cleared the squad car, defendant pulled away harder, although McNeil was still holding his left wrist.  Defendant spun toward Johnson's golf cart and "attempted to either get inside of it or grab a hold of it."  McNeil pulled back defendant's arm, straightening it.  McNeil put an arm bar on him and, when defendant continued to pull away, executed an arm bar takedown.  Defendant became more aggressive and reached for a vehicle to pull himself away from McNeil.

¶ 18    McNeil hit the ground and knew immediately that he had injured his ankle.  Defendant continued to resist being handcuffed.  Ultimately, McNeil got his arm inside defendant's and, using leverage, handcuffed him.

¶ 19    When McNeil stood up, he could not put his full weight on the ankle.  An ambulance took him to the emergency room, where he was diagnosed with a sprained ankle.  Emergency room personnel placed the ankle in an air cast and gave McNeil crutches.

¶ 20    Johnson testified that when she arrived, McNeil was trying to get defendant to put his hands behind his back.  At some point, defendant grabbed the steering wheel–presumably of her golf cart–to get away.  She used her cell phone to record a video of the remainder of the incident.

¶ 21    Defendant testified that he was living at his mother's apartment.  He went to the balcony to smoke a cigarette when he saw Holmgren, who he did not recognize.  Holmgren was watching his every movement, so defendant became suspicious.  He went downstairs and asked Holmgren who he was and what he was doing there, but Holmgren did not respond.  Defendant denied threatening to kill him.  Defendant did not recall anything about his encounter with McNeil.

¶ 22    The jury found defendant guilty of aggravated resisting a peace officer and disorderly conduct. The court sentenced him to two years' probation and 215 days in jail for resisting and 30 days in jail for disorderly conduct. Defendant timely appeals.

¶ 23                              II. ANALYSIS

¶ 24    Defendant first contends that he was not proved guilty beyond a reasonable doubt of aggravated resisting a peace officer. "When reviewing the sufficiency of the evidence, 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' (Emphasis in original.)" *People v. Bishop*, 218 Ill. 2d 232, 249 (2006) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). Defendant was convicted of aggravated resisting a peace officer. The statute provides that one who "knowingly resists or obstructs the performance by one known to the person to be a peace officer *** of any authorized act within his or her official capacity commits a Class A misdemeanor." 720 ILCS 5/31-1(a) (West 2016). However, the offense becomes a Class 4 felony if the "violation was the proximate cause of an injury to a peace officer." *Id.*, § 31-1(a-7).

¶ 25    "Proximate cause" describes two distinct requirements: cause in fact and legal cause. *People v. Cervantes*, 408 Ill. App. 3d 906, 909 (2011). "Legal cause 'is essentially a question of foreseeability.' " *Id.* (quoting *First Springfield Bank & Trust V. Galman*, 188 Ill. 2d 252, 258 (1999)). The key question is whether the injury is one that a reasonable person would foresee as a likely result of his or her conduct. *Id.*

¶ 26    Defendant argues that his resistance did not proximately cause McNeil's ankle injury where he was only "mildly" resisting by walking away to use the restroom. Rather, defendant contends, the sole proximate cause of McNeil's injuries was his decision to use excessive force.

He argues that he could not reasonably foresee that McNeil would resort to violence in response to his "mild" resistance. Defendant concedes that an officer "is justified in the use of any force which he reasonably believes to be necessary to effect the arrest." 720 ILCS 5/7-5(a) (West 2016). However, he asserts that McNeil's use of force was unreasonable where defendant was merely ignoring verbal commands while walking away to use the restroom when McNeil violently and unexpectedly tackled him.

¶ 27　Defendant's argument is based on a highly selective reading of the evidence. The testimony of McNeil and Holmgren allowed the jury to infer that defendant actively resisted McNeil's less forceful attempts to secure his compliance. McNeil testified that he told defendant several times to stop because he needed to talk to him. McNeil reached for defendant's wrist several times to handcuff him, but defendant continued to pull his arm away, push off with his free arm, and walk past McNeil. Only after these less forceful methods failed did McNeil decide to execute the arm bar. Even after being tackled, defendant continued to struggle. Holmgren corroborated much of McNeil's testimony.

¶ 28　Defendant's argument seems to be based on the fact that neither of two videos, shot by Johnson's cell phone and McNeil's dashcam, shows defendant forcefully resisting before being taken down. However, defendant concedes that the videos do not show everything that happened and that they were admitted primarily for their audio. Johnson's cell phone video begins immediately before defendant is tackled. On the dashcam video, virtually all of the action takes place off-camera. Thus, neither video clearly contradicts McNeil's testimony that defendant forcefully resisted.

¶ 29　Even if we accepted defendant's assertion that he did not forcefully resist, however, we would not conclude that McNeil's response was unreasonable. Defendant's assertion that he

merely needed to use the restroom did not compel McNeil to show restraint. McNeil knew that defendant had been harassing Holmgren for some time but, immediately after McNeil said he needed to talk to him, defendant suddenly claimed a need to use the bathroom. Defendant appeared intoxicated and was acting erratically. He had already threatened to kill Holmgren, and it was entirely possible that he was leaving to retrieve a weapon. Even if defendant was not forcibly resisting, McNeil was not required to let him simply walk away after he ignored verbal commands.

¶ 30   In *Cervantes*, an officer was injured while chasing the defendant on foot through snow-covered fields. The defendant argued that the weather conditions, rather than his resistance, proximately caused the officer's injuries. After noting that the issue was essentially one of foreseeability, and that the defendant's conduct need not be the *sole* proximate cause of the officer's injuries, we held that it was reasonably foreseeable that if the defendant led officers on a chase through ice and snow, one of the officers might slip and hurt himself. *Cervantes*, 408 Ill. App. 3d at 909-10.

¶ 31   Defendant contends that *Cervantes* is distinguishable because McNeil's "drastic" decision to take down defendant was not reasonably foreseeable. As noted, however, this argument relies on the admittedly incomplete videos while ignoring McNeil's testimony. McNeil testified that defendant physically struggled with him before being taken down. McNeil further said that he told defendant several times that he intended to arrest him. The jury could infer from McNeil's testimony that it was reasonably foreseeable that a prolonged struggle against being handcuffed would cause McNeil to resort to more forcible means to gain compliance.

¶ 32   Defendant next contends that he was not proved guilty beyond a reasonable doubt of disorderly conduct where Holmgren testified that he did not take defendant's threats seriously. As charged here, one is guilty of disorderly conduct if he or she "knowingly *** [d]oes any act in

such unreasonable manner as to alarm or disturb another and to provoke a breach of the peace." 720 ILCS 5/26-1(a)(1) (West 2016). The purpose of the disorderly-conduct statute is to protect against " 'an invasion of the right of others not to be molested or harassed, either mentally or physically, without justification.' " *People v. Davis*, 82 Ill. 2d 534, 538 (1980) (quoting Ill. Ann. Stat., ch. 38, ¶ 26-1, Committee Comments-1961, at 149 (Smith-Hurd 1977)). The types of conduct potentially covered by the statute " 'almost defy definition.' " *Id.* at 537 (quoting Ill. Ann. Stat., ch. 38, ¶ 26-1, Committee Comments-1961, at 149 (Smith-Hurd 1977)). The inquiry is necessarily fact-specific and " 'embraces a wide variety of conduct serving to destroy or menace the public order and tranquility.' " *People v. McLennon*, 2011 IL App (2d) 091299, ¶ 30 (quoting *In re B.C.*, 176 Ill. 2d 536, 552 (1997)). "[C]ulpability *** revolves not only around the type of conduct, but is equally dependent upon the surrounding circumstances." *Davis*, 82 Ill. 2d at 537. "Generally, to breach the peace, a defendant's conduct must threaten another or have an effect on the surrounding crowd." *McLennon*, 2011 IL App (2d) 091299, ¶ 31.

¶ 33 Defendant contends that Holmgren's testimony shows that he was not in fact alarmed or disturbed by defendant's conduct as, according to Holmgren, "[i]t just didn't seem serious" and Holmgren "didn't really feel threatened by it." The State, citing the statutory definition of "knowledge," responds that the test is whether defendant was "consciously aware that his or her conduct" would tend to alarm or disturb another, not the actual effect of that conduct on others. See 720 ILCS 5/4-5(a) (West 2016). The State concludes that defendant should have known that his conduct would tend to alarm or disturb a reasonable person, and that he should not avoid conviction merely because Holmgren chose to exercise restraint in responding to his harassment.

¶ 34 We agree with the State. Defendant explicitly threatened Holmgren's life. Threats presumptively fall within the purview of the statute. *McLennon*, 2011 IL App (2d) 091299, ¶ 31.

We further agree with the State that the inquiry is whether defendant knew or should have known that his conduct would likely alarm or disturb a reasonable person, regardless of its actual effect on the listener. Here, in addition to verbally threatening Holmgren, defendant got in his truck and threatened to steal it and snatched defendant's headphones. Defendant knew or should have known that this conduct would likely alarm a reasonable person.

¶ 35    In any event, defendant's conduct apparently did affect Holmgren. At trial he attempted to minimize its impact, but he also testified that he kept a length of two-by-four handy in case he needed to defend himself. He asked his boss to call the police and, almost as soon as McNeil arrived, approached him and reported defendant's threat to kill him. Thus, despite his trial testimony that he did not take defendant's threats seriously, Holmgren clearly treated them as something more than a joke.

¶ 36    Defendant cites *People v. Bradshaw*, 116 Ill. App. 3d 421 (1983), where the defendant stood outside a bar yelling obscenities. He was convicted of disorderly conduct, but the reviewing court reversed his conviction. *Id.* at 422. Unlike in this case, the defendant did not expressly threaten anyone. He did not get in anyone's vehicle or take personal property from anyone's person, as defendant did here. These factual distinctions show that defendant's conduct was more serious than that of the defendant in *Bradshaw*.

¶ 37    After viewing the evidence in the light most favorable to the prosecution, the evidence was sufficient to prove defendant guilty of aggravated resisting a peace officer and disorderly conduct beyond a reasonable doubt. See *Bishop*, 218 Ill 2d at 249.

¶ 38                                III. CONCLUSION

¶ 39    The judgment of the circuit court of Lake County is affirmed.

¶ 40    Affirmed.