# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *People v. Haissig*, 2012 IL App (2d) 110726

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. SANDRA HAISSIG, Defendant-Appellant.–THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. EDWARD GOLDEN, Defendant-Appellant. |
| District & No. | Second District<br>Docket Nos. 2-11-0726, 2-11-0728 cons. |
| Filed | September 12, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendants were not prejudiced by their appellate counsel's failure to include in the appellate record the trial court's statement of the reasons for convicting defendants of theft by deception based on performing work for their employer under an assumed name in violation of their employer's policies, including the finding that the employer suffered no pecuniary loss, since the services defendants rendered for their employer had no bearing on whether defendants intended to deprive their employer of the "use or benefit" of its funds. |
| Decision Under Review | Appeal from the Circuit Court of Lake County, Nos. 00-CF-1400, 00-CF-1401; the Hon. Victoria A. Rossetti, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on
Appeal

Gregory C. Nikitas, of Law Office of Gregory C. Nikitas, of Waukegan, for appellant.

Michael J. Waller, State's Attorney, of Waukegan (Lawrence M. Bauer and Joan M. Kripke, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

Panel

JUSTICE BIRKETT delivered the judgment of the court, with opinion.
Justices McLaren and Zenoff concurred in the judgment and opinion.

## OPINION

¶ 1    Defendants, Sandra Haissig and Edward Golden, were convicted of two counts of theft of over $100,000 from their employer, Abbott Laboratories (Abbott) (720 ILCS 5/16-1(a)(1)(A), (a)(2)(A) (West 2000)). The circuitous history of this case has generated two prior dispositions from this court (in 2003 and 2007), and one disposition (2008) and one supervisory order (2011) from the supreme court. Most of those proceedings are recounted in *People v. Golden*, 229 Ill. 2d 277 (2008), yet there have been years of proceedings since that decision. In its present form, the case comes before us on the denial of defendants' petition under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2008)).[1] In their petition, defendants alleged that defense counsel in their direct appeal were ineffective for failing to include critical transcripts in the appellate record, which failure caused the appellate court to reject as forfeited their argument that the State failed to prove their guilt beyond a reasonable doubt. *Golden*, 229 Ill. 2d at 279. We hold that the petition was properly denied because defendants failed to establish that appellate counsel's omission prejudiced them.

¶ 2                              BACKGROUND

¶ 3    Defendants were charged with five counts of theft involving Abbott. Counts II and V charged defendants with stealing electronics from Abbott. The remaining counts dealt with a different set of circumstances. The parties agree on the essential facts. During defendants' employment with Abbott, the company had a policy requiring employees to disclose any personal financial interests they had in firms doing business with Abbott. Defendants formed a company named Elevator Components, Inc. Over a period of several months, Elevator Components received approximately $300,000 from Abbott in exchange for elevator

---

[1]Defendants' cases had separate docket numbers. Identical postconviction petitions were filed in the cases, and we refer to them as a single petition.

services. Defendants did not disclose to Abbott their interest in Elevator Components but in fact fabricated a contact name for the company. Count I charged defendants with obtaining unauthorized control of Abbott's funds. See 720 ILCS 5/16-1(a)(1)(A) (West 2000). Count III charged defendants with obtaining Abbott's funds by deception, namely, using Elevator Components to shield their identities from Abbott. See 720 ILCS 5/16-1(a)(2)(A) (West 2000). Count IV also charged theft by deception and alleged that defendants submitted to Abbott invoices falsely claiming that elevator work had been done. The common allegation in all three counts, and the focus of this appeal, is that defendants intended to permanently deprive Abbott of the use or benefit of the funds it paid for the elevator work. See 720 ILCS 5/16-1(a)(1)(A), (a)(2)(A) (West 2000).

¶ 4 Defendants were tried to the bench. The State relied on alternative theories. The State's lead argument was that defendants were guilty under counts I and III because they received funds from Abbott under false pretenses, regardless of whether Abbott received fair value for the funds. The State then argued that, even if what Abbott received was relevant to whether a theft occurred, defendants were still guilty under count IV because defendants did not perform all of the work for which Abbott contracted. Defendants contested both points.

¶ 5 The court acquitted defendants on counts II and V.[2] The court also acquitted defendants on count IV because the State failed to prove beyond a reasonable doubt that "any particular repair was not completed by the defendants." The court then turned to counts I and III, both of which it construed as alleging theft by deception. That Abbott received the services for which it contracted, albeit under a false impression as to the provider, prompted the court to ask, with respect to counts I and III, "[C]an the crime of theft by deception be committed when the victim sustains no monetary loss?" The court answered yes. The court cited the Illinois decisions of *People v. Kotlarz*, 193 Ill. 2d 272 (2000), and *People v. Gayton*, 293 Ill. App. 3d 442 (1997), but found neither case directly on point. After reviewing foreign authorities and a treatise on criminal law, the court convicted defendants on counts I and III despite Abbott's having "received the benefit of all of the work being performed that it paid for." The court imposed sentence on count III alone. Defendants were each sentenced to probation and periodic imprisonment. No restitution was ordered. The court's rationale for the sentence, including its decision not to order restitution, is unknown because the transcript of the sentencing hearing is not in the record.

¶ 6 Defendants appealed to this court. On April 8, 2002, this court granted defendant Haissig's motion to stay her term of periodic imprisonment pending appeal. In their briefs to this court, defendants argued that, because (as the trial court determined) Abbott received from defendants all services for which it contracted, they could not, as a matter of law, be guilty of theft. This court rejected that argument as forfeited because defendants failed to include in the appellate record a transcript of the hearing at which the trial court made its findings of fact and entered the convictions and acquittals. See *People v. Haissig*, Nos. 2-01-1410, 2-01-1411 cons. (2003) (unpublished order under Supreme Court Rule 23).

---

[2]The transcript of the trial court's factual findings and rationales for the acquittals and convictions was not included in the record until the postconviction proceeding.

¶ 7        The ensuing years saw further proceedings in the trial and reviewing courts, but the phase of the case that is our direct concern here began on June 3, 2009, when defendants filed their "Amended Second Supplemental Post Conviction Petition" (postconviction petition). Defendants alleged that appellate counsel was ineffective because, but for counsel's incompetence in failing to include the transcript of the court's factual findings and rationales, the appellate court would have reached, and accepted, defendants' argument that, as a matter of law, they were not guilty of theft.

¶ 8        On June 29, 2009, the State filed a motion to dismiss the petition for failing to develop the claim of ineffectiveness. On December 7, 2010,[3] after hearing argument, the court denied the motion. The court determined that there were "sufficient issues [raised in the petition] with regard to an appeal." The court set December 15 for hearing on "the petition itself." On December 15, after hearing argument, the court granted defendants' petition. As relief, the court allowed defendants to file their appeal "with proper documentation." On March 16, 2011, the supreme court entered a supervisory order directing the trial court to vacate that part of its December 15 order "allowing defendants to file a new appeal as a remedy for the finding of ineffective assistance of counsel." *People v. Rossetti*, No. 111883 (Ill. Mar. 16, 2011). The supreme court directed the trial court to enter an order consistent with section 122-6 of the Act (725 ILCS 5/122-6 (West 2008)), which states:

> "Disposition in Trial Court. The court may receive proof by affidavits, depositions, oral testimony, or other evidence. In its discretion the court may order the petitioner brought before the court for the hearing. If the court finds in favor of the petitioner, it shall enter an appropriate order with respect to the judgment or sentence in the former proceedings and such supplementary orders as to rearraignment, retrial, custody, bail or discharge as may be necessary and proper."

¶ 9        The case was remanded, and, on June 28, 2011, the trial court held another hearing on the petition. That same day, the court denied the petition. The court reasoned that, though appellate counsel fell below reasonable professional norms in failing to include a transcript of the trial court's ruling, defendants failed to establish a reasonable probability that, but for counsel's error, they would have prevailed on appeal. In this regard, the court held that "theft by deception may be committed regardless of direct proof of an actual monetary loss by the victim."

¶ 10       Defendants filed timely appeals, which we consolidated.


¶ 11                                    ANALYSIS

¶ 12       Defendants challenge the denial of their petition, specifically the trial court's holding that sections 16-1(a)(1)(A) and (a)(2)(A) of the Criminal Code of 1961 (Criminal Code) (720 ILCS 5/16-1(a)(1)(A), (a)(2)(A) (West 2000)) do not require proof that the victim suffered pecuniary loss.

¶ 13       The Act provides a remedy for criminal defendants who have suffered substantial

---

[3]The record does not reveal the reason for this substantial delay.

violations of their constitutional rights. *People v. Mauro*, 362 Ill. App. 3d 440, 441 (2005). Defendants alleged in their petition that appellate counsel's failure to file the transcript of the court's guilty finding denied them their right to effective assistance of counsel, guaranteed by both the Illinois and the United States Constitutions. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8. Ineffective-assistance-of-counsel claims are governed by the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), and adopted by our supreme court in *People v. Albanese*, 104 Ill. 2d 504 (1984). To prevail on a claim of ineffective assistance, the defendant must show both that counsel's performance was deficient and that the deficiency prejudiced the defendant. *Strickland*, 466 U.S. at 687. More specifically, the defendant must demonstrate that counsel's performance was objectively unreasonable under prevailing professional norms and that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A defendant alleging ineffectiveness of appellate counsel must establish both that appellate counsel's performance was deficient and that a reasonable probability exists that, but for counsel's errors, the appeal would have been successful. *Golden*, 229 Ill. 2d at 283.

¶ 14     In noncapital cases, the Act prescribes a three-stage process for adjudicating a postconviction petition. *Id.* The parties disagree as to which stage the petition had reached before defendants took this appeal. Defendants claim that the petition had reached the third stage, while the State claims that it reached only the second stage. All indications are that the petition reached the third stage. The State's motion to dismiss was denied, the trial court set the case for hearing on the "petition itself," and the State filed its answer. See *People v. Pendleton*, 223 Ill. 2d 458, 472-73 (2006) ("If [the State's motion to dismiss] is denied, or if no motion to dismiss is filed, the State must answer the petition, and, barring the allowance of further pleadings by the court, the proceeding then advances to the third stage, a hearing wherein the defendant may present evidence in support of the petition." (citing 725 ILCS 5/122-6 (West 2008)). Ultimately, however, the disagreement does not impact our standard of review. The *de novo* standard of review applies equally to a second-stage dismissal based on the pleadings and to a third-stage denial where there were no contested issues of fact. See *id.* at 473. Here, no evidence was presented at any of the hearings on the petition; the issue of defendants' guilt was presented as a pure question of law. Our review is *de novo*.

¶ 15     The issue on appeal is narrow. There is no dispute that appellate counsel's performance was objectively unreasonable for counsel's failure to file the transcript. The contested issue is whether this court, if provided that transcript, would have determined as a matter of law that defendants were not guilty of theft. The elements of theft are set forth in section 16-1 of the Criminal Code, which provides:

"(a) A person commits theft when he [or she] knowingly:

(1) Obtains or exerts unauthorized control over property of the owner; or

(2) Obtains by deception control over property of the owner; or

(3) Obtains by threat control over property of the owner; or

(4) Obtains control over stolen property knowing the property to have been stolen or under such circumstances as would reasonably induce him or her to believe that the property was stolen; or

-5-

(5) Obtains or exerts control over property in the custody of any law enforcement agency which is explicitly represented to him by any law enforcement officer or any individual acting in behalf of a law enforcement agency as being stolen, and

(A) Intends to deprive the owner permanently of the use or benefit of the property; or

(B) Knowingly uses, conceals or abandons the property in such manner as to deprive the owner permanently of such use or benefit; or

(C) Uses, conceals, or abandons the property knowing such use, concealment or abandonment probably will deprive the owner permanently of such use or benefit." 720 ILCS 5/16-1 (West 2000).

Defendants were convicted under both subsections (a)(1)(A) and (a)(2)(A).

¶ 16    We initially note that defendants make a brief allusion to subsection (1), stating:

"[T]he phrase 'unauthorized control' within the statute providing that a person commits theft when he knowingly obtains or exerts unauthorized control over [the] property of [the] owner and intends to deprive [the] owner permanently of [the] use or benefit of [the] property, means control exercised over property of another without consent of [the] owner."

¶ 17    This argument is forfeited for want of development. First, the only authority defendants cite for this proposition is an abstract opinion, *People v. Hoy*, 12 Ill. App. 3d 524 (1973), and defendants have failed to provide this court a copy of *Hoy*.[4] See Unif. Admin. & Procedural Rs. for the App. Cts. R. 8 (eff. Jan. 1, 1967) (an abstract opinion cannot be cited unless the entire text of the case is appended to the brief); Ill. S. Ct. R. 341(h)(7) (eff. July 1, 2008) (argument must be supported by citation to authority). Second, defendants cite the proposition from *Hoy* without articulating an argument based on it. See Ill. S. Ct. R. 341(h)(7) (eff. July 1, 2008) (argument consists of the party's "contentions *** and the reasons therefor"); *Wolfe v. Menard, Inc.*, 364 Ill. App. 3d 338, 348 (2006) ("A conclusory assertion, without supporting analysis, is not enough" to constitute an argument under Rule 341(h)(7)).

¶ 18    In the remainder of their discussion, defendants argue that the State failed to prove that they, in the language of the statute, "[i]ntend[ed] to deprive the owner [Abbott] permanently of the use or benefit of [its] property" (720 ILCS 5/16-1(a)(1)(A), (a)(2)(A) (West 2000))–a common element of the two offenses of which defendants were convicted, and the only element on which defendants have articulated a position. Defendants begin with the trial court's finding, not disputed in this court, that Abbott received all services for which it contracted. Defendants argue:

"There simply is no authority to support the trial court's finding that the offense of theft of money by deception can occur, given the statutory elements of that offense in the State

---

[4]Defendants appear to have quoted verbatim one of the headnotes in *Hoy* provided by the online research service Westlaw. Defendants should have known that such headnotes do not have precedential value.

of Illinois, when the complaining witness suffers no monetary loss. Had the Illinois statute included the term 'possession, use, or benefit[,]' and not merely 'use or benefit,' defendants might arguably be guilty of theft by deception. *** No reported case construing or applying a statute similar to Illinois' theft statute permits a conviction based upon fraudulent possession without a deprivation of use or benefit. In essence, the complaining witness may not receive the benefit of the bargain and then cry thief because they had been deceived as to the identity [*sic*] with whom they have dealt. *** The offense of theft by deception requires proof that the complaining witness was deprived of the use or benefit of their property.

*** 

The trial court judge never ordered any restitution in the sentencing of the [d]efendants[ ] in this matter[,] which further supports the defendants' contention that there was no pecuniary loss to Abbott.

It is also worth noting that the trial court's reliance on [*Kotlarz*] is misplaced. [Citation.] In *Kotlarz*, there was no issue that the defendant deprived the victim of the use or benefit of almost two hundred [and] forty thousand dollars. *** [T]he trial court's finding [in this case] was that [d]efendants were guilty of [t]heft by [d]eception because they obtained the possession of Abbott['s] money. That is not what is provided for in the Illinois statute. Because Illinois law requires permanent deprivation of the use or benefit of the property and not merely some possession for some period of time, the [d]efendants are not guilty of [t]heft by [d]eception. Here, Abbott received the benefit of [its] bargain. The only deception was as to the identities of those [*sic*] Abbott was providing compensation for services rendered.

The plain meaning of the words 'use' or 'benefit' means that one receives an advantage, gain, or profit. *** Abbott received labor and work performed for exactly what it contracted [d]efendants to provide, the repair and operation of its elevators. Abbott was not found to have suffered any monetary loss and received exactly what it bargained for–elevator repairs and the continued operation of those serviced elevators."

¶ 19   The State argues that all of defendants' points in the above passage are forfeited for failure to cite any authority. Defendants' failure to cite any authority in their favor is especially notable given their suggestion that such authority exists. They claim that no reported case involving a statute similar to Illinois's theft statute "permits a conviction" where there has been no "deprivation of use or benefit." This seems to imply that there exist foreign cases addressing the issue at hand and holding that no conviction of theft can lie where there has been no "deprivation of use or benefit" (at least as defendants conceive of that concept). Defendants, however, do not share any foreign authorities with us. In fact, as the State notes, they cite no cases at all in their favor, whether Illinois or foreign. At oral argument, defense counsel confirmed that he knows of no case supporting defendants' position on the elements of theft. The State also does not cite any case addressing section 16-1 or a similar statute, an approach that seems in keeping with the position that defendants' points are forfeited and do not deserve engagement on the merits.

¶ 20   Defendants do, we note, make an argument based on the statutory language itself. The

State contends that this argument, too, is forfeited for failure to cite authority. It is true that defendants, while attempting a textual analysis, cite no principle of statutory interpretation. While we would be justified in finding their argument forfeited, we will discuss it. See *People v. Carter*, 208 Ill. 2d 309, 318-19 (2003) (forfeiture is a limitation on the parties, not the court). Before proceeding to their argument, we set forth the basic principles guiding our review of section 16-1. The goal of statutory construction is to ascertain the intent of the legislature, the best indicator of which is the statutory language itself, given its plain and ordinary meaning. *People v. Howard*, 233 Ill. 2d 213, 218 (2009). Where the language is clear and unambiguous, we must give effect to it without resorting to further aids of construction. *People v. Collins*, 214 Ill. 2d 206, 214 (2005). "Although ambiguous penal statutes should be construed to afford lenity to the accused [citation], such rule does not justify the failure to apply a criminal statute where the legislature clearly intended its application." *In re B.C.*, 176 Ill. 2d 536, 551 (1997); see also *People v. Kelly*, 344 Ill. App. 3d 1058, 1063 (2003) ("While it is true that ambiguities in a penal statute generally are construed strictly in favor of defendants [citation], this rule does not require us to interpret a statute in a manner that yields an absurd result, particularly where *** that result runs directly contrary to the purpose of the statute."). We mention other canons in the course of our analysis.

¶ 21   Defendants find significant that subsection (A) of section 16-1 punishes not the intent merely to take possession of the owner's property, but the intent to deprive the owner of the "use or benefit" of the property. They argue that, while they unquestionably intended to deprive Abbott of the possession of its funds, they did not intend to deprive Abbott of the "use or benefit" of the funds, because they aimed to give Abbott "the benefit of [its] bargain" by providing all services for which it contracted, and did not intend to inflict pecuniary loss. Under this interpretation of subsection (A), whether the defendant intends to deprive the owner of the "use or benefit" of the owner's property is determined by what, if any, property, services, or value the defendant intends to render to the owner. According to defendants, if what the defendant intends to give the owner is of such value that, despite the owner's loss of the property that is the subject of the criminal charge, the owner would suffer no financial detriment, then the defendant does not intend to deprive the owner of the "use or benefit" of his property.

¶ 22   Defendants' position, as we will shortly demonstrate, lacks textual support in the theft statute. It is no surprise that our criminal law would not countenance a theory that renders theft sheerly a matter of financial loss and ignores the serious affront to security and autonomy that occurs whenever one's property is taken by deception or through some other form of unauthorized control. In the classic theft scenario where the property is taken without the owner's consent, such as the surreptitious stealing of, say, a valueless watercolor painting from the owner's house, the defendant's leaving behind a priceless Monet painting, resulting in ultimate financial gain to the owner, does not remedy the violation of personal security and domestic integrity. It would be obtuse to suggest that the "use or benefit" of the watercolor consisted in its being swapped, *without the owner's consent*, for the much more valuable Monet painting. The defendant cannot foist his own notion of "use or benefit" on the owner. The owner decides for himself the purpose for his property, within objectively reasonable

limits.[5] The owner might have intended to display the watercolor for years to come, or instead to sell or exchange it the very next day. In any case, where the defendant intends to retain the property permanently, he necessarily intends to deprive the owner of all reasonably conceivable use or benefit.

¶ 23    In the case, as here, of a bargained purchase, where the defendant has materially deceived the owner as to the defendant's identity or the nature or condition of the property or service he is purchasing, and the owner is not the worse financially for the deception,[6] the owner still is deprived of the "use or benefit" of his funds because he has lost the opportunity to dispose of them with knowledge of the material facts. The "use or benefit" of the funds does not consist of the property or services that the owner received in the fraudulent transaction, no matter whether they met or exceeded the value of what the owner contracted to receive. Just as the defendant in the prior hypothetical could not determine the "use or benefit" of the owner's valueless watercolor by substituting a priceless Monet in its place, so neither, in the case of a purchase transaction, does the "use or benefit" of the purchaser's funds consist of the performance, tainted by fraud, that the seller renders.

¶ 24    We turn to the text of section 16-1 of the Criminal Code to explain our holding. We know of no Illinois decision construing section 16-1 for the purpose of determining if guilt may lie under subsection (A) where the defendant intends to deprive the owner permanently of the property yet does not intend to inflict financial loss on the owner. The issue hinges on whether the "use or benefit," as used in subsection (A), is determined by what, if any, property, services, or value the defendant intends to give the owner. The phrase "use or benefit" appears also in subsections (B) and (C) but is nowhere defined in the Criminal Code. "When a statutory term is undefined, it is appropriate to employ a dictionary definition to ascertain its meaning." *People v. Comage*, 241 Ill. 2d 139, 144 (2011). Black's Law Dictionary defines "use" as "[t]he application or employment of something; esp., a long-continued possession and employment of a thing for the purpose for which it is adapted, as distinguished from a possession and employment that is merely temporary or occasional." Black's Law Dictionary 1540 (7th ed. 1999). "Benefit" is defined as "[a]dvantage; privilege" or "[p]rofit or gain." Black's Law Dictionary 150 (7th ed. 1999).

¶ 25    "Permanent deprivation" is defined in the Criminal Code. Section 15-3 (720 ILCS 5/15-3 (West 2000)) states that "permanent deprivation" means to:

"(a) Defeat all recovery of the property by the owner; or

(b) Deprive the owner permanently of the beneficial use of the property; or

---

[5]For instance, if the defendant takes the owner's car for a one-day joyride before returning it, and there is no dispute that the defendant did not intend to retain the car permanently, the owner cannot claim that the "use or benefit" of which he was deprived consisted of hopping to Halley's Comet and then to Jupiter, which were in alignment for that day alone and would not again be so within the owner's lifetime.

[6]For example, the owner might have been deceived into thinking he was purchasing a relatively worthless watercolor when in fact the painting is a priceless Monet.

(c) Retain the property with intent to restore it to the owner only if the owner purchases or leases it back, or pays a reward or other compensation for its return; or

(d) Sell, give, pledge, or otherwise transfer any interest in the property or subject it to the claim of a person other than the owner."

None of the foregoing definitions lends clear direction here. We must look further into the statute.

¶ 26 "Section 16-1 defines the two elements necessary to constitute a theft–a proscribed act and the requisite intent." *People v. Cleveland*, 104 Ill. App. 2d 415, 418 (1969). Subsections (1) through (5) "describe[ ] the act which may be involved in the offense of theft," while subsections (A) through (C) "describe[ ] the mental state of the perpetrator of the act, or his conduct from which the mental state is presumed, which must accompany the act." *People v. Haynes*, 132 Ill. App. 2d 1031, 1032 (1971). "[T]he offense of theft is committed when any one of the acts listed in [subsections (1) through (5)] coincides with any one of the mental states or actions indicating a mental state listed in [subsections (A) through (C)]." *Id.* More precisely, "[t]he crime of theft requires proof of *two* mental states." (Emphasis added.) *People v. Jones*, 149 Ill. 2d 288, 296 (1992). "The theft statute initially requires that a person act knowingly in obtaining control over the property of another." *Id.* "Additionally, the theft statute requires that a person have the intent (or other mental state as specified in the statute) to deprive the owner permanently of the use or benefit of the property." *Id.* The mental state specified in subsection (A) is the "inten[t] to deprive the owner permanently of the use or benefit of the property." Defining intentional action, section 4-4 of the Criminal Code (720 ILCS 5/4-4 (West 2000)) states:

"A person intends, or acts intentionally or with intent, to accomplish a result or engage in conduct described by the statute defining the offense, when his conscious objective or purpose is to accomplish that result or engage in that conduct."

¶ 27 The "other mental state[s]" to which the *Jones* court alluded are specified in subsections (B) and (C). Both provisions require proof that the defendant "use[d]," "conceal[ed]," or "abandon[ed]" the property. Subsection (B) requires proof that the defendant "[k]nowingly" used, concealed, or abandoned the property "in such manner as to deprive the owner permanently of [the] use or benefit [of the property]." Subsection (C) requires proof that the defendant used, concealed, or abandoned the property "knowing such [action] probably will deprive the owner permanently of such use or benefit." Section 4-5 of the Criminal Code (720 ILCS 5/4-5 (West 2000)) defines the concept of knowing action:

"A person knows, or acts knowingly or with knowledge of:

(a) The nature or attendant circumstances of his or her conduct, described by the statute defining the offense, when he [or she] is consciously aware that his [or her] conduct is of such nature or that such circumstances exist. Knowledge of a material fact includes awareness of the substantial probability that such fact exists.

(b) The result of his [or her] conduct, described by the statute defining the offense, when he [or she] is consciously aware that such result is practically certain to be caused by his conduct."

¶ 28 Subsections (B) and (C) are closely related but distinct. Subsection (B) punishes knowing

-10-

use, concealment, or abandonment that deprives the owner permanently of the use or benefit of the property. Subsection (C) punishes use, concealment, or abandonment that the defendant knows will *probably* deprive the owner permanently of the use or benefit of the property. Subsection (C) does not require actual deprivation, but only action that the defendant knows will likely cause deprivation. Consider a defendant who snatches an object of apparent value from the driver of a convertible that is standing at a stoplight in a coastal town. The defendant flees on foot and, quickly discovering that he has no liking for the object, casts it off a seaside cliff. In one scenario, the object lands in the ocean and is lost. The defendant is guilty under subsection (B) because he knowingly abandoned the property in such a way as to entirely eliminate its use or benefit. In another scenario, the object fortuitously lands in the lap of the owner, who now happens to be traveling on a cliffside road below. In this scenario, the defendant, who abandoned the object knowing that it would probably be unrecoverable, is guilty under subsection (C). He is no less culpable merely because the owner ultimately recovered the property.

¶ 29      While subsection (A) differs from both (B) and (C) in the mental state required, central to all three provisions is the concept of permanently depriving the owner of the use or benefit of his property. Here it is vital to note that subsections (B) and (C) condition liability on the defendant's actions with respect to the owner's property, *i.e.*, use, abandonment, or concealment of the property. Indeed, *only* the defendant's actions with respect to the property itself are the focus of those subsections. The subsections simply do not address any other action by the defendant, such as his transfer of separate property, services (*e.g.*, as here, elevator repair services), or other value to the owner. "Where [its] language is clear, the statute may not be revised to include exceptions, limitations, or conditions that the legislature did not express." *People v. Davis*, 2012 IL App (2d) 100934, ¶ 14 (element of criminal trespass to property (720 ILCS 5/19-4(a)(2) (West 2008)) that "without authority, [the defendant] knowingly enters the residence of another," does not require proof that the defendant knew he had lacked authority to enter the residence). As subsections (B) and (C) specify no other factor by which to judge whether the owner has been deprived of the "use or benefit" of his property, the defendant's treatment of the owner's property solely determines whether the owner has been deprived of its "use or benefit."

¶ 30      We may illustrate with the example of a bartered exchange of paintings. Tom and John each own priceless art collections, but lately they have developed an obsession for the paintings of a certain local artist, which both Tom and John freely acknowledge are nearly worthless on the art market. They agree to trade two such works from this artist. The work that John agrees to trade is exactly as he represents, the work of that local artist. However, the work that Tom agrees to trade is actually a priceless Monet painting that he knowingly misrepresents to be the work of the local artist. They exchange the paintings. Tom quickly becomes bored with the painting he received from John and incinerates it. Tom is guilty of theft. First, he acquired John's painting under false pretenses. Second, the question of whether Tom deprived John of the "use or benefit" of his painting depended on how Tom "used," "abandoned," or "concealed" the painting. As Tom destroyed the painting, it ceased to be of any "use or benefit" to John. The "use or benefit" of the painting did not consist of the fact that John received a Monet in exchange for it. Tom is as guilty of theft as if there had

-11-

been no bargained exchange of art and he had taken the painting without John's knowledge and destroyed it.

¶ 31       As for subsection (A), the provision under which defendants were convicted, its plain language sets it apart from subsections (B) and (C) in two respects. First, subsection (A) requires "intent" to deprive the owner permanently of the use or benefit of his property. Second, subsection (A) specifies no categories of action by the defendant (such as use, concealment, or abandonment), and therefore appears not to require any action by the defendant in addition to an *actus reus* specified in subsections (1) through (5). In requiring a higher mental state than subsections (B) and (C), yet being more inclusive as to the acts serving as proof, subsection (A) is at once broader and narrower than the other two subsections. Case law recognizes that proof of intent under subsection (A) can take diverse forms. "A defendant's intent to permanently deprive the owner of property may be deduced by the trier of fact from the facts and circumstances surrounding the alleged criminal act." *Veasey*, 251 Ill. App. 3d at 591. Depending on the facts of the case, the taking or control established under subsections (1) through (5) may be all the proof needed under subsection (A). *Id.* "For example, it has been generally recognized that an intent to permanently deprive the owner of his property may ordinarily be inferred when a person takes the property of another. [Citations.] This is particularly true when the owner of the property is a stranger to the accused. [Citation.]" *Id.* at 592. The language of section 16-1 is so comprehensive that "virtually any kind of theft can be described by combining one of the first [five] subsections with one of the three subsections describing [the] mental state of the accused." *Haynes*, 132 Ill. App. 2d at 1032. Indeed, the current section 16-1, which took effect in 1961, "is a comprehensive codification of the broad range of offenses against property that have long been familiar to our statutory and common law." *People v. Harden*, 42 Ill. 2d 301, 304 (1969).

          " 'Formerly, in Illinois, there were some seventy-four separate sections which dealt in one form or another with the obtaining of property of another with the intent to permanently deprive such other or the true owner of the property or its beneficial use. All lawyers and judges are too familiar with the highly technical differences between larceny, larceny by trick, embezzlement, false pretenses, confidence game, and the many variations to require detailed comment. Suffice to say that, with the exception of robbery, burglary, arson, and criminal damage and trespass to property, which are covered respectively in Articles 18, 19, 20 and 21, the Committee intended to codify the entire range of offenses against property into Articles 16 and 17, and to abolish completely the labels and highly technical distinctions which had developed through centuries of case law and statutory amendments.' " *People v. McCarty*, 94 Ill. 2d 28, 34 (1983) (quoting Ill. Ann. Stat., ch. 38, art. 16, Committee Comments-1961, at 18 (Smith-Hurd 1977)).

¶ 32       We hold that, under subsection (A), as under subsections (B) and (C), whether the owner has been deprived of the "use or benefit" of his property depends strictly on the defendant's actions toward that property and not on any separate property, services, or value given to the owner by the defendant. We reach this conclusion by applying a well-established canon of statutory interpretation. We have construed subsections (B) and (C) to mean that deprivation of "use or benefit" consists entirely of how the defendant treats the owner's property (*i.e.*,

for purposes of these subsections, the defendant's "use," "concealment," or "abandonment" of the property). The concept of deprivation of "use or benefit" is used as well in subsection (A), but is not expressly tied to the defendant's actions toward the owner's property. However, "where a word or phrase is used in different sections of the same legislative act, a court presumes that the word or phrase is used with the same meaning throughout the act, unless a contrary legislative intent is clearly expressed." *Robbins v. Board of Trustees of the Carbondale Police Pension Fund*, 177 Ill. 2d 533, 541 (1997). Accordingly, in order to harmonize subsection (A) with subsections (B) and (C), we must hold that whether a defendant "[i]ntends to deprive the owner permanently of the use or benefit of the property" is determined only by the defendant's actions (intended or performed) toward the owner's property. We cannot, however, go so far as to conclude that proof of intent under subsection (A) requires proof of the defendant's "use," "concealment," or "abandonment" as is required under subsections (B) and (C). We conclude, rather, that the omission of more specific language in subsection (A) was deliberate and that proof of intent is not limited to the categories of action–use, abandonment, and concealment–specified in the other two subsections. See *People v. Santiago*, 236 Ill. 2d 417, 431 (2010) ("by employing certain language in one instance and wholly different language in another, the legislature indicates that different results were intended" (internal quotation marks omitted)). Given that subsection (A) specifies no further action by the defendant, proof of intent could include the defendant's use, abandonment, or concealment of the property, or consist entirely of his initial taking or control over the property under circumstances suggesting that he intends to permanently retain it.

¶ 33    Thus, a fact finder might well conclude from the above hypothetical of the art transaction that Tom, by destroying John's painting, intended to deprive John permanently of the use or benefit of his property. Even if Tom did not destroy the painting, the fact finder could still find the requisite intent because Tom had no plans to return the painting to John. In either case, Tom intended to permanently deprive John of the "use or benefit" of his property. The finding of intent would have no basis other than that Tom did not intend to restore the property to John. The "use or benefit" of John's painting did not consist of his obtaining, by exchange, a priceless Monet painting. Intent to deprive under subsection (A) is not determined by what separate property the owner receives from the defendant. Thus, Tom's guilt under subsection (A) is not impacted by the fact that John is the better financially for the transaction. Subsection (A) requires proof that the defendant intended to permanently deprive the owner of the use or benefit of his property, but does not require proof that the defendant intended to inflict ultimate financial detriment on the owner.

¶ 34    We return now to defendants' argument that, since subsection (A) does not read, "[i]ntends to deprive the owner permanently of the *possession*, use, or benefit of the property," the legislature must not have intended to punish the intent merely to dispossess the owner, even permanently, of his property. According to defendants, whether the owner has retained the "use or benefit" of his property depends on the financial condition in which the defendant leaves him, which must take into account any property or (as in the case at hand) services received from the defendant. We have already determined, however, that subsections (B) and (C) judge deprivation of "use or benefit" strictly by how the defendant

treats the owner's property, and that defendants have not overcome the presumption that this concept of deprivation is part of subsection (A) as well. The legislature may well have reasoned that, since permanent deprivation of possession is *a fortiori* permanent deprivation of "use or benefit," it would have been redundant to add "possession." The converse does not hold, however, because permanent deprivation of "use or benefit" does not necessarily require permanent deprivation of possession. A defendant might snatch the owner's wristwatch just long enough to smash it, and then return it.

¶ 35    The implications of the foregoing for the facts at hand are clear. There is no dispute that defendants' acquisition of Abbott's funds constituted both a taking by deception and an exertion of unauthorized control, per subsections (a)(1) and (a)(2). There also is no dispute that defendants intended to deprive Abbott permanently of the funds. As we have construed subsection (A), the intent to deprive Abbott permanently of the funds was *a fortiori* an intent to deprive it permanently of the "use or benefit" of the funds. It is irrelevant under subsection (A) that defendants intended to render all services for which Abbott contracted. Defendants still intended to permanently deprive Abbott of the "use or benefit" of the funds, for no other reason than that defendants intended to permanently retain them.

¶ 36    We have researched cases from jurisdictions with theft statutes similarly phrased as ours, where theft consists, *inter alia*, of some manner of unauthorized control over the owner's property together with the intent to permanently deprive the owner of the use or benefit of the property. We have found a split of opinion on whether liability for theft is judged strictly by what the defendant takes from the owner, or whether the State must prove that the owner suffered pecuniary loss in light of what he received from the defendant.

¶ 37    In *State v. Stephens*, 953 P.2d 1373 (Kan. 1998), the defendant was charged under the state theft statute, which criminalized, *inter alia*, the "obtaining by deception [of] control over property," "done with intent to deprive the owner permanently of the possession, use or benefit of the owner's property." Kan. Stat. Ann. § 21-3701(a)(2). The defendant was charged with felony theft in that he obtained property of a value of $25,000 or more. See Kan. Stat. Ann. § 21-3701(b)(1). The trial court dismissed the State's case at the preliminary hearing. The evidence at the hearing established that the victims, who were looking for a business to purchase, entered into discussions with the defendant, whose liquor store was for sale. The defendant presented the victims with purported copies of income statements that the defendant had submitted to the state revenue department. The victims, relying on the income represented in the statements, agreed to purchase the liquor store, and submitted a cashier's check for $57,000, the purchase price. Later, the victims discovered that the documents shown them were not accurate copies of the originals filed with the revenue department but overstated the business's income. *Stephens*, 953 P.2d at 1374-75.

¶ 38    The trial court held that, despite proof that the defendant acquired by false pretenses a check for $57,000, the State failed to establish that the defendant obtained property of $25,000 or more. The court reasoned that the value of what the victims acquired from the defendant had to be considered in judging the grade of the offense. The court noted that, though it had to assume that the liquor store was of some value, there was no proof of that value. *Id.* at 1375.

¶ 39    The supreme court, reversing the dismissal of the indictment, held that the trial court erred in considering the value of what the victims received from the defendant. The supreme court began with the principle, which it found stated in its prior decision in *State v. Aiken*, 254 P.2d 264, 268 (Kan. 1953), as well as in foreign cases, that the crime of theft by deception "is completed at the moment the victim is fraudulently induced to part with his or her property." *Stephens*, 953 P.2d at 1378. The court went on:

> "Here, the property which the Smiths parted with and defendant obtained was the $57,000 check. The theft occurred at the moment the Smiths were fraudulently induced to part with that check. The degree of a theft crime is determined by the value of the stolen property. [Citation.] The property stolen was the check for $57,000. The value of what the Smiths received or the extent of their loss is immaterial in determining the degree of the theft." *Id.*

¶ 40    The New Hampshire theft statute construed in *State v. Kelly*, 484 A.2d 1066 (N.H. 1984), provided that a "person commits theft if he obtains or exercises control over property of another by deception and with a purpose to deprive him thereof." N.H. Rev. Stat. Ann. § 637:4(I) (Supp. 1983). The statute defined "[p]urpose to deprive" as having, *inter alia*, "the conscious object *** [t]o withhold property permanently or for so extended a period or to use under such circumstances that a substantial portion of its economic value, or of the use and benefit thereof, would be lost." N.H. Rev. Stat. Ann. § 637:2(III)(a) (Supp. 1983). In *Kelly*, the defendant, who had sold a car to the victim, was charged with theft because he had altered the odometer in order to induce the victim to make the purchase. At trial, the defendant offered evidence that the car was worth more than the victim had paid for it, even with the proper mileage considered. The trial court ruled that the evidence was immaterial to the defendant's guilt of theft by deception. *Kelly*, 484 A.2d at 1067. The supreme court reversed, holding that evidence of what, if any, pecuniary loss was suffered by the victim was relevant to the defendant's guilt of theft by deception. In the first section of its analysis, the court relied on a Michigan case in holding that the intent to permanently deprive the owner of the value, use, or benefit of the property exists only to the extent that the loss to the owner is exceeded by what he receives from the defendant:

> "In the situation where property is exchanged between two willing parties, even if fraud is committed, the deceiving party can only intend to deprive the victim of the value of the victim's property that exceeds the value of the property which the victim receives in exchange. [*People v. McCoy*, 254 N.W.2d 829, 834-35 (Mich. App. 1977).] The value of the property received by Baranski is therefore relevant evidence and should have been admitted." *Kelly*, 484 A.2d at 1067.

¶ 41    The defendant in *McCoy* was prosecuted for obtaining property by false pretenses. Although the offense was codified in the Michigan statutes and the court cited the provision, the court never quoted the statutory elements. Instead, the court relied first on a definition from a criminal treatise: " 'To constitute the offense of obtaining property by false pretenses it is necessary to show that the actions of the victim in reliance on the defendant's misrepresentation have caused the victim loss or that the victim has been prejudiced in some way.' " *McCoy*, 254 N.W.2d at 835 (quoting 2 Ronald A. Anderson, Wharton's Criminal Law & Procedure § 602, at 360 (1957)). The court also cited a remark from the Supreme

Court of Michigan in *People v. Larco*, 49 N.W.2d 358, 363 (Mich. 1951): "To support a conviction of obtaining money under false pretenses it was incumbent on the people to establish by competent evidence and beyond a reasonable doubt \*\*\* that the person sought to be deceived relied thereon to his detriment." The *McCoy* court held that *Larco* left no doubt that "Michigan is a jurisdiction which follows the general rule that pecuniary loss to the victim must be shown." *McCoy*, 254 N.W.2d at 835.

¶ 42    In the second section of its analysis, the *Kelly* court appeared to apply a rule of lenity:

"Furthermore, \*\*\* we do not believe that the legislature intended the statutory offense of theft by deception, potentially punishable as a Class A felony, to reach situations like the present one, where the alleged victim, in a bargaining exchange, has, if the evidence as to the value of the Cutlass is to be believed, received value in excess of the consideration he paid. [Section] 637:4, on its face, appears applicable to the facts presented in the case at bar. [Citation.] However, the potential penalty to the defendant is so severe when compared to the 'loss,' if any, sustained by the victim, that we decline to find the statutory offense of theft by deception applicable in situations where the 'victim' receives value in excess of the consideration paid, absent a clear indication of legislative intent. [Citation.]" *Kelly*, 484 A.2d at 1067-68.

¶ 43    We side with the Kansas court in *Stephens*, but our foremost reason is that the text of our own theft statute requires it. Sections 16-1(a)(1)(A) and (a)(2)(A), unlike the elements of the crime of obtaining property by deception as laid out in the Michigan case of *McCoy*, contain no requirement of prejudice to the owner. Moreover, we disagree with the court in *Kelly* that the legislature must make explicit that the intent to inflict pecuniary loss is *not* required in a prosecution for theft, otherwise the element will be read into the statute. Our own rule of lenity requires us to construe statutes in favor of the accused only where there is ambiguity. We have found no ambiguity in subsection (A)'s phrase, "[i]ntends to deprive the owner permanently of the use or benefit of the property," although there is no express statement there or elsewhere in section 16-1 that the State need not prove intent to inflict pecuniary loss. We will not distort the statute by requiring the State to prove an additional element, namely, pecuniary loss.

¶ 44    Although we know of no Illinois precedent that undertakes a textual analysis of section 16-1 as we do today, our reading of the statute is reinforced by comments in prior Illinois cases akin to the comments in the precedents on which the court in *Stephens* relied. The *Stephens* court cited for support its prior holding that the crime of theft by deception is complete "at the moment the victim is fraudulently induced to part with his or her property" (*Stephens*, 953 A.2d at 1378 (citing *Aiken*, 254 P.2d at 1378)). In *People v. Havener*, 13 Ill. App. 3d 312 (1973), the appellate court made a similar comment about section 16-1. The defendant in *Havener* was tried on theft, robbery, and aggravated battery charges. The jury returned a verdict of guilt on the theft charge but failed to reach a verdict on the remaining two charges. The defendant argued that the jury's failure to reach a verdict on the robbery and aggravated battery charges was inconsistent with its verdict of guilt on the theft charge. *Id.* at 314. The appellate court held that there was no inconsistency, because the three offenses had different elements:

"*[T]he offense of theft would be completed upon the exerting of unauthorized control over the property of the victim with the intent to deprive him permanently of it* without regard to whether the property had originally been taken by force from the person or presence of the owner, or whether great bodily harm had been done to the victim. The police officers testified that the wallet was in the defendant's car a half hour or more after the circumstances upon which robbery and aggravated [battery are] based. The record is silent as to any justifiable possession by either him or his companion." (Emphasis added.) *Id.* at 314-15.

¶ 45    In *People v. Lardner*, 300 Ill. 264 (1921), the supreme court applied the larceny statute, one of the forerunners to section 16-1. See *People v. Perry*, 224 Ill. 2d 312, 339-40 (2007) (explaining that section 16-1 is a consolidation of various crimes against property, including larceny, and construing section 16-1 in light of case law on the former larceny statute). The defendant in *Lardner* was in a retail store when he was spotted taking several handbags from a display and placing them in the overcoat that he was carrying over his arm. A store employee approached and questioned him. The defendant became angry and left the store. The defendant's overcoat was found lying on a display about six feet from the display from which he had taken the handbags. *Lardner*, 300 Ill. at 265-66. The supreme court held that the defendant was guilty of larceny even though he did not leave the store with the handbags. *Id.* at 267-68. The court said:

"Taking goods and putting them into a place for convenient removal is the taking of property, *and if one takes the goods of another out of the place where they are put, although he is detected before they are actually carried from the owner's premises, the crime is complete*, as in the case of the removal of an article from one place to another in the same house." (Emphasis added.) *Id.* at 267.

¶ 46    We draw from *Havener* and *Lardner* that the crime of theft–as with its ancestor, larceny–is complete when the defendant obtains or exerts unauthorized control over the property of the owner. This is consistent with the upshot of our statutory analysis, which is that liability for theft depends strictly on the defendant's actions with respect to the property of the owner–whether that be use, concealment, abandonment, or simply the taking and retention of the property–and not on any value that the defendant gives or intends to give the owner. Phrased more specifically to the issue at hand, the State need not prove that the defendant, in view of what he intended to give the owner, aimed to inflict financial detriment.

¶ 47    In rendering this holding, we are mindful of a line of decisions holding that attempts at restitution are relevant in determining intent to commit theft. The earliest cases in this line predate the 1961 revision of the Criminal Code and concern prosecutions for the variety of theft formerly known as embezzlement. In *People v. Barrett*, 405 Ill. 188, 198 (1950), the defendant, at the close of the evidence at his trial for embezzlement, offered restitution to the victims. The court reversed the defendant's conviction, in part because of the offers of restitution. *Id.* at 198-99. The court noted that embezzlement requires specific intent and that, hence, " '[m]ere proof of the receipt of [the victim's] funds and failure to account therefor is not sufficient, in itself, to show embezzlement.' " *Id.* at 197 (quoting *People v. Ervin*, 342 Ill. 421, 427 (1930)). " 'Embezzlement involves secrecy and the concealment by the

-17-

defendant of his conversion. The absence of such proof is a circumstance which tends to negative the charge that the defendant was actuated by a felonious intent.' " *Id.* at 198 (quoting *People v. Parker*, 355 Ill. 258, 286 (1934)). The court observed that "a defendant charged with embezzlement should be permitted to show in his defense such facts and circumstances as tend to rebut the presumption that he intended to commit the crime." *Id.* at 197-98. The court noted that, though it is "elementary *** that an offer of restitution in a crime of embezzlement or larceny is not a defense to the crime," such an offer is among the "material facts to be taken into consideration in determining whether or not the necessary criminal intent is present which is an essential element in the crime of embezzlement." *Id.* at 198-99.

¶ 48    The supreme court cited *Barrett* in *People v. Riggins*, 13 Ill. 2d 134, 139-40 (1958), where the defendant, a bill collector, was prosecuted for embezzling amounts he collected on a delinquent account at a jewelry store. The defendant diverted the funds to his personal use. In the several months that passed since the account was paid, the defendant twice admitted to the jeweler that he did not have the funds and promised to pay her when he could. The defendant never remitted the funds. *Id.* at 137-38. The court affirmed the defendant's conviction:

> "[T]he defendant concealed his use of the money and postponed discovery by promises to bring it in; if defendant is to be believed he at all times accounted for the money and was given extended time in which [to] remit it. *** We find nothing which impels us to disturb the jury's finding and are constrained to remark that the promises and alleged disclosures, which were not forthcoming until defendant was called upon to account for the money he collected, are of little effect in negating felonious intent. If there is a wilful and wrongful taking, use, and appropriation of an employer's money by an agent, the criminality of the act is not removed by an intention to make restitution." *Id.* at 139-40.

The court immediately added, citing *Barrett*, that "[t]he intention to restore or replace does not make an intentional purloining, secretion or appropriation of the money of another any the less an embezzlement." *Id.* at 140.

¶ 49    *Riggins* was consistent with *Barrett* in holding that restitution does not negate the criminality of the act. Also in line with *Barrett*, *Riggins* did not go so far as to hold that restitution is immaterial to the question of intent.

¶ 50    The final two cases we mention are *People v. Campbell*, 28 Ill. App. 3d 480 (1975), and *People v. Reans*, 20 Ill. App. 3d 1005 (1974), both decided under the 1961 revision. The defendant in *Reans* was charged under the former section 16-1(d)(1) (Ill. Rev. Stat. 1969, ch. 38, ¶ 16-1(d)(1)), which is now codified at section 16-1(a)(2)(A). The trial court barred evidence that the defendant attempted restitution after the theft charges were filed. The appellate court upheld the exclusion. The court first recognized that accomplished or attempted restitution does not nullify a theft but may be relevant to show the absence of intent. *Reans*, 20 Ill. App. 3d at 1008. The court further noted that it "would normally favor the admission of evidence of attempts at restitution for the purpose of having a jury or trier of fact consider these activities with all other facts in determining the absence or presence of felonious intent in a prosecution." *Id.* at 1008-09. The court held, however, that the

-18-

exclusion of evidence in that case "was not sufficiently prejudicial to constitute reversible error," because the defendant was permitted to introduce evidence that he made attempts at restitution before he was charged. *Id.* at 1009.

¶ 51     The defendant in *Campbell*, an elected official of a sanitary district, was charged with theft for embezzling funds from the district. The opinion did not indicate under which subsection of section 16-1 the defendant was charged, but the court framed the issue on appeal as whether the evidence showed that he "possessed the intent to permanently deprive the sanitary district of the funds." *Campbell*, 28 Ill. App. 3d at 483. The evidence showed that the sanitary district had agreed to rent some of its flood protection equipment to a municipality. Checks that the municipality issued as rental payments were written to the defendant himself. The defendant cashed the checks and did not turn the funds over to the district. *Id.* at 482-83. During his examination of the State's witnesses, the defendant moved to introduce evidence that he ultimately returned the funds. The trial court excluded the evidence because it exceeded the scope of the State's direct examination. *Id.* at 489-90. Later, in his own testimony, defendant related that, approximately 16 months after he cashed the checks, he notified the municipality that he wished to return the money. Two months later, the defendant remitted funds to the municipality in the amount of the checks he cashed. *Id.* at 483.

¶ 52     On appeal from his conviction of theft, the defendant argued that the trial court erred in excluding evidence that he returned the funds. The appellate court agreed that the exclusion was error. Citing *Barrett*, the court noted that, "[w]hile the fact that the defendant has made restitution is no defense to the charge of theft, it is a factor which is relevant in determining the absence of the requisite felonious intent." *Id.* at 490. The exclusion was not prejudicial, however, because the defendant presented "substantially the same evidence" during his testimony. *Id.*

¶ 53     From these four cases we derive the principle that, while restitution cannot negate the crime of theft, restitution (or attempts thereat) may be relevant to show the absence of an intent to deprive the owner permanently of his property. Because intent under subsection (A) is not just intent to inflict pecuniary loss on the owner, but intent to deprive him permanently of *this* property, restitution is relevant only if it constitutes the return of *this* property, unless the owner's property is (like the funds taken in *Barrett* and its progeny) fungible. Hence, where a defendant improperly obtains a vase and later smashes it, his volunteered restitution in the form of money does not bear upon whether he intended to permanently deprive the owner of the *vase*.

¶ 54     Here, if defendants had offered or made restitution, such evidence would be potentially relevant as elucidating their intent with respect to the property they took. The services that they rendered to Abbott were not, however, intended as restitution but as a *quid pro quo* in a bargained transaction. Nor, intentions aside, were they of the proper form to be restitution evidence material under *Barrett*. Defendants' provision of services to Abbott had nothing to do with their intentions regarding their disposition of the funds they received from Abbott. The issue under subsection (A) is whether defendants intended to retain the funds, not whether they intended to inflict ultimate pecuniary loss on Abbott.

¶ 55    Even if, as we firmly deny, subsection (A) were ambiguous as to whether deprivation of "use or benefit" of the owner's property should be measured, as under subsections (B) and (C), by the defendant's treatment of the property itself, we would still not embrace defendants' interpretation. "While it is true that ambiguities in a penal statute generally are construed strictly in favor of defendants [citation], this rule does not require us to interpret a statute in a manner that yields an absurd result, particularly where, as here, that result runs directly contrary to the purpose of the statute." *Kelly*, 344 Ill. App. 3d at 1063. The purpose of the theft statute is not complicated: it is to protect property owners. *People v. Petro*, 179 Ill. App. 3d 1018, 1021 (1989). Defendants' reading of subsection (A) would, quite simply, legitimize the unauthorized taking of another's property in *any* situation as long as the State fails to prove that the defendant intended the owner to suffer financial loss. Defendants suggest that Abbott is not a sympathetic victim, because it received all services for which it bargained. Abbott, however, had a policy requiring all employees to disclose any interest in firms seeking to do business with Abbott. Defendants deceived Abbott as to their identities. In these circumstances, the "use or benefit" to Abbott of its funds consisted of its disposing of them knowingly, in transactions with parties who truthfully represented their identities so that Abbott could do business consistent with its policies. Defendants' action infringed Abbott's right to autonomy in the disposition of its funds.

¶ 56    Section 16-1 is not the only provision in the Criminal Code that rejects the notion that a party may materially misrepresent its identity in order to transact business with the victim and then claim as a defense that it fulfilled its obligations under the contract and, hence, inflicted no financial loss on the victim. Section 33-7 of the Criminal Code provides in relevant part:

"(a) A public contractor; a person seeking a public contract on behalf of himself, herself, or another; an employee of a public contractor; or a person seeking a public contract on behalf of himself, herself, or another commits public contractor misconduct when, in the performance of, or in connection with, a contract with the State, a unit of local government, or a school district or in obtaining or seeking to obtain such a contract he or she commits any of the following acts:

***

(2) knowingly performs an act that he or she knows he or she is forbidden by law to perform;

* * *

(5) knowingly or intentionally seeks or receives compensation or reimbursement for goods and services he or she purported to deliver or render, but failed to do so pursuant to the terms of the contract, to the unit of State or local government or school district.

(b) Sentence. *** Any person convicted of this offense or a similar offense in any state of the United States which contains the same elements of this offense shall be barred for 10 years from the date of conviction from contracting with, employment by, or holding public office with the State or any unit of local government or school district." 720 ILCS 5/33-7 (West 2010).

¶ 57 Let us suppose that John Jones, a road contractor, contracts with a certain city to resurface a road. The contract calls for four inches of asphalt but Jones provides only three. The city pays under the contract. Jones is convicted under section 33-7(a)(5) and, pursuant to section 33-7(b), is banned from contracting with any unit of local government for 10 years. Two years later, Jones, falsely representing his identity, contracts with a county to resurface a road. Although Jones's work under the contract is perfect, he is guilty under section 33-7(a)(2) for performing an act forbidden by law. Jones is also guilty under sections 16-1(a)(1)(C) and (a)(2)(C) because he deceived the county into believing that he was a legitimate contractor, and because he permanently deprived the county of the "benefit" of transacting business with a proper party.

¶ 58 The lack of merit in defendants' position is further seen by supposing that Abbott discovered the deception before defendants performed any work but after Abbott made an initial payment of $10,000. Under defendants' logic, their intent to complete the project would be a defense to theft of the $10,000.

¶ 59 Moreover, if we embraced defendants' interpretation of subsection (A), we would have to apply it far beyond the context of a bargained exchange, to scenarios that defendants might well have not envisioned. Let us suppose, for example, that defendants never contracted with Abbott, even under an assumed name, and simply stole the money from Abbott. While stealing it, however, defendants had the intent to make Abbott whole by providing elevator repair services, albeit unbeknown to Abbott. After several weeks of diligently working after hours tuning the elevators and repairing problems before Abbott discovered them, defendants had rendered services worth the money they stole. We can also reverse the order of events so that defendants render the elevator services before they steal the money from Abbott. Under defendants' interpretation of section 16-1, there is no plausible basis for finding a theft in either of these hypotheticals yet not on the facts at hand. In neither of the three cases was there any pecuniary loss to Abbott. If defendants would claim that a difference lay in the fact that, in the hypotheticals, Abbott did not retain the "use or benefit" it intended for its funds, because it did not voluntarily relinquish them, it can be equally said on the present facts that Abbott did not retain the "use or benefit" of its funds, because it was deprived of the opportunity to dispense them to whom it pleased. See *United States v. Rowe*, 56 F.2d 747, 749 (2d Cir. 1932) ("A man is none the less cheated out of his property, when he is induced to part with it by fraud, because he gets a quid pro quo of equal value. It may be impossible to measure his loss by the gross scales available to a court, but he has suffered a wrong; he has lost his chance to bargain with the facts before him."); *State v. Bouchard*, 881 A.2d 1130, 1134 (Me. 2005) ("[A] theft is committed when the actor deprives an owner of the control or use of the owner's property, regardless of whether, in the end, the owner suffered a resulting financial loss. Here, the State suffered a deprivation because, by Bouchard's deceptive acts, it lost control over to whom its money was paid, even though the money paid was used to purchase goods the State needed and otherwise would have purchased.").[7]

---

[7] We give no details of these cases because the theft statutes that the cases apply are phrased materially differently than section 16-1. We cite them for their apt phrasing of a policy that appears to be enshrined in section 16-1.

¶ 60 We can imagine other kinds of scenarios. For instance, there are items of property that the owner will not part with even for adequate compensation and that an unscrupulous coveter will be willing to take without the owner's consent as long as, by rendering compensation (such as by leaving some cash on the empty vase stand), he will avoid criminal liability. Defendants' reading of section 16-1(A) would legitimize all manner of such "forced sales." We cannot accept that the legislature would have passed a theft statute that disregarded values such as security of the home or business, personal or business integrity, and autonomy in the disposition of one's own property. Consequently, even if subsection (A) were ambiguous, we would reject defendants' construction.

¶ 61 We note that, though defendants cite no cases in their favor, they do distinguish *Kotlarz* and argue that the trial court erroneously relied on it. The trial court, however, cited *Kotlarz* not for its facts but for its outline of the elements of theft by deception. The issue in *Kotlarz* was whether the defendant was guilty of theft, specifically, whether the element of deception was proved by evidence that the defendant manipulated the contracting parties into paying a broker's fee where no brokering was done and the proceeds went to the defendant and an associate to whom the defendant owed a favor. See *Kotlarz*, 193 Ill. 2d at 302-06. Here, there is no dispute that defendants deceived Abbott.

¶ 62 Defendants' final point is that the lack of a restitution order underscores the fact that Abbott suffered no pecuniary loss. We have already determined that the lack of pecuniary loss by Abbott is inconsequential to the theft charges.

¶ 63 We conclude that, under subsection (A) of section 16-1, the services that defendants rendered to Abbott have no bearing on whether they intended to deprive Abbott permanently of the "use or benefit" of its funds. Defendants intended permanent deprivation because, as is undisputed, they intended to permanently retain Abbott's funds. Because defendants' challenge to the sufficiency of the evidence would not have prevailed on direct appeal in any event, defendants were not prejudiced by appellate counsel's failure to include in the appellate record the transcript of the trial court's reasons for convicting defendants of theft. Accordingly, we affirm the denial of defendants' postconviction petition.

¶ 64 CONCLUSION

¶ 65 For the foregoing reasons, we affirm the judgment of the circuit court of Lake County.

¶ 66 Affirmed.